523 So.2d 68 (1988)
James Harvey NICHOLSON
v.
STATE of Mississippi.
No. 57471.
Supreme Court of Mississippi.
March 16, 1988.
*70 B. Jackson Thames, Jr., Newton, and Rex Gordon, Jr., Union, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
DAN M. LEE, Presiding Justice, for the Court:
James Harvey Nicholson was convicted on a charge of rape and sentenced to a term of 30 years in custody of the Mississippi Department of Corrections on April 16, 1986. From that conviction and sentence Mr. Nicholson appeals, assigning the following as error:
I. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
II. THE COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS PHOTOGRAPHIC LINEUP, VOICE IDENTIFICATION TESTS, AND THE RESULTING IN-COURT IDENTIFICATION.
III. THE COURT ERRED IN REQUIRING THE JURY TO GIVE A NUMERICAL DIVISION PERTAINING TO THEIR BEING DEAD-LOCKED.
During the evening of August 29, 1985, Sandra McKinion was sleeping in bed with her two-year-old daughter. During the early morning hours of August 30, she awoke to find someone standing over her with a knife to her head. This man told her to pull off her clothes, after which he raped her. After he finished he forced her to perform fellatio on him, after which he raped her again. Ms. McKinion made no resistance because she was frightened  the man had threatened to kill her and her baby if she made any noise. The lighting was such that she was able to see a tattoo on this man's right arm which said "IOA" with some sort of writing under it. She also noticed a scar on his rib cage. She noted that he was a black man with short hair, a light beard, and a little mustache. After the man finished raping her, he went to the kitchen and turned on the light, found her purse, and rummaged through it for money. He then went to the living room and lay on the couch and demanded that she turn on the stereo. He left between 4:00 and 5:00 a.m., repeating his admonition that if she told the law, he would kill her. Ms. McKinion had never seen the man before. However, at trial Ms. McKinion identified the man as the defendant (appellant here).
After he left she got her baby and went to her neighbor's apartment where the police were summoned. She gave the police a description, then the officer took her to the hospital where a rape kit was performed.

DISCUSSION

I. The Guilty Verdict Handed Down in Newton County Circuit Court was Against the Overwhelming Weight of the Evidence and, Accordingly, the Defendant Should Have Been Found Not Guilty.
In his first assignment of error Mr. Nicholson argues that the jury verdict was against the weight of the evidence because the state's case, based primarily on the testimony of the victim, Ms. McKinion, contains discrepancies and lacks credibility. He raised this issue in his motion for directed verdict at the close of the state's evidence and again on motion for JNOV or a new trial, all being overruled. The state counters that because Mr. Nicholson argues only that the state's evidence lacks credibility, his assignment of error is without merit due to the scope of review of jury findings this Court follows.
This Court has often stated the limitations upon its scope of review of a jury's findings of fact. In Billiot v. State, 454 So.2d 445, 463 (Miss. 1984), the Court stated, "the jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." Id. at 463. Further, in Kinzey v. State, 498 So.2d 814 (Miss. 1986), this Court stated, *71 "the credibility of the witnesses at trial is not a matter for the reviewing court's evaluation." Id. at 818. Where the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict. Gandy v. State, 373 So.2d 1042, 1045 (Miss. 1979); Shannon v. State, 321 So.2d 1, 2 (Miss. 1975); Bond v. State, 249 Miss. 352, 356-57, 162 So.2d 510, 512 (1964). The jury's findings will not be disturbed by this Court unless the verdict is so contrary to the overwhelming weight of the evidence that "to allow it to stand would be to sanction an unconscionable injustice." Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983); Groseclose v. State, 440 So.2d 297 (Miss. 1983). See also, Russell v. State, 506 So.2d 974, 977 (Miss. 1987); Shive v. State, 507 So.2d 898, 900 (Miss. 1987); Johnson v. State, 511 So.2d 1360, 1367 (Miss. 1987).
Since the evidence basically presented a question of whether or not the victim was telling the truth about the identity of her assailant, the jury's duty was to determine the credibility of this witness. Therefore, this assignment of error is without merit.

II. THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS PHOTOGRAPHIC LINEUP, VOICE IDENTIFICATION TESTS, AND THE RESULTING IN-COURT IDENTIFICATION.
Under this assignment of error, Mr. Nicholson argues three issues: (1) that the "showup" (actually a voice "overhearing") of the defendant on September 3, 1985, was an impermissible ploy by the state to allow Ms. McKinion to identify the defendant as her assailant; (2) that the voice identification "lineup" conducted by the Newton Police Department on September 5, 1985, was calculated to be suggestive as to the identity of the defendant; (3) that the photographic lineup shown to Ms. McKinion on September 5 was suggestive because the defendant was the only one of the six pictured with bare arms displaying a tattoo; therefore, the argument continues, the in-court identification of the defendant was impermissibly tainted. As such, the defendant was denied due process of law under the Fourteenth Amendment. Further, Nicholson argues that his Sixth Amendment right to counsel was violated because the pre-trial identifications were conducted in the absence of counsel for the defendant. A suppression hearing was held as to the pre-trial identifications. The trial judge overruled the motion to suppress, allowing testimony as to the pre-trial identifications and allowing Ms. McKinion to make an in-court identification of the defendant. The three identification procedures will be analyzed in turn.

A. Scope of Review of Trial Court's Suppression Hearing Findings.

This Court has stated its scope of review of suppression hearing findings in pre-trial identification cases as follows:
The combined effect of the circuit court's pre-trial and trial rulings is that of a finding of fact that, under the totality of the circumstances ... in-court identification testimony had not been impermissibly tainted. We may, of course, disturb such a finding only where there is an absence of substantial credible evidence supporting it. [emphasis added]
Ray v. State, 503 So.2d 222, 224 (Miss. 1986). Therefore, this Court must determine if, in this case, there is substantial credible evidence supporting the trial judge's findings.

B. The Photographic Display.

The "Wade Trilogy" and its progeny are the guidelines this Court must follow in determining the competency of identification testimony. York v. State, 413 So.2d 1372, 1374 (Miss. 1983). York is the leading case in Mississippi on this issue and has been followed by this Court on numerous occasions. See e.g., Davis v. State, 510 So.2d 794 (Miss. 1987); White v. State, 507 So.2d 98 (Miss. 1987); Jones v. State, 504 So.2d 1196 (Miss. 1987); Smith v. State, 492 So.2d 260 (Miss. 1986). As pointed out in York, there are two lines of analysis when considering pre-trial identifications: the Fourteenth Amendment due process analysis *72 and the Sixth Amendment right-to-counsel analysis. Mr. Nicholson raises both points in his assignment of error, claiming that the photographic display was suggestive and that it was conducted in the absence of his legal counsel.
In United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the United States Supreme Court held that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted ... for the purpose of allowing a witness to attempt an identification of the offender." Ash at 321, 93 S.Ct. at 2579. Therefore, this aspect of Mr. Nicholson's argument is without merit.
His argument under the due process analysis has to do with suggestiveness of the photographic display. He points out that he was the only one of the six men who was pictured with bare arms, prominently displaying his tattoo, a characteristic described to police by Ms. McKinion. Such is undeniably a suggestive photographic display. See Bankston v. State, 391 So.2d 1005, 1008 (Miss. 1980) (holding that showing the victim only one photograph of a man with a mustache was impermissibly suggestive). A series of photographs where one is "conspicuously singled out in some manner from others ... is impermissibly suggestive." York at 1383, citing Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) and Simmons v. U.S., 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). However, an impermissibly suggestive pre-trial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure "unless: (1) from the totality of the circumstances surrounding it, (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." York at 1383, citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and Simmons, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). York continues that "even if testimony is proffered of the out-of-court identification itself," as was done in this case, the same standard applies, except with the omission of the word "irreparable," a slightly higher burden of proof for the state. York at 1383, citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). York goes on to set out the Neil factors to consider in determining whether these standards have been fulfilled:
1. Opportunity of the witness to view the accused at the time of the crime;
2. The degree of attention exhibited by the witness;
3. The accuracy of the witness's prior description of the criminal;
4. The level of certainty exhibited by the witness at the confrontation;
5. The length of time between the crime and the confrontation.
York at 1383; Neil, 409 U.S. at 199, 93 S.Ct. at 382. See also Ray v. State, 503 So.2d at 223.
Applying these factors to the present case,

1. Opportunity to view the accused.

Ms. McKinion testified that at the time of the attack, the lighting in her bedroom was sufficient to permit her to observe her assailant's face and parts of his body. The man remained in the bedroom about 15 minutes. She also observed him under the kitchen light for five or ten minutes, and in her living room for another 15 or 20 minutes. This testimony shows ample opportunity for Ms. McKinion to observe her assailant.

2. Degree of attention.

During her observation of her assailant, Ms. McKinion noticed he had a short, neat haircut, a little mustache, a space between his front teeth, and a tattoo with the letters "IOA" on his arm, and a scar on his rib cage.

3. Accuracy of prior description.

Officer Allen testified that Ms. McKinion provided the above description when she first reported the rape. This turned out to be an accurate description of Mr. Nicholson.

*73 4. Witness's level of certainty at confrontation.

Upon viewing the photographic display, Ms. McKinion immediately identified Mr. Nicholson.

5. Length of time between the crime and the confrontation.

The photographic display was conducted only six days after the crime.
There is ample credible evidence to support the trial court's determination that there was no substantial likelihood of irreparable misidentification in allowing the in-court identification, nor was there substantial likelihood of misidentification in allowing the testimony of the out-of-court identification itself.

C. The "Accidental" Voice "Show-up" or "Speak-up"

Officer Clarence Allen brought Ms. McKinion to the police station on the night of September 3 at 11:30 p.m. for further questioning. Mr. Nicholson was in a room with the door shut talking with Police Chief Joe Mowdy. As Ms. McKinion walked into the station, she overheard Nicholson's voice and immediately identified the voice as that of her assailant. She became upset and Officer Allen immediately drove her back home. Officer Allen testified that he knew Nicholson was in the station that night, but that knowledge did not prompt him to bring Ms. McKinion into the station, nor did he expect Nicholson to still be there when he returned with Ms. McKinion. He did not tell Ms. McKinion that Nicholson was at the station. Police Chief Mowdy testified that he did not know Ms. McKinion was in the station, that he and Nicholson were behind a closed door, and that there was no ploy to effect a "show-up." Thus, there is substantial evidence that this incident was inadvertent.
Mr. Nicholson claims that his Sixth Amendment right to counsel was violated. In Thompson v. State, 483 So.2d 690 (Miss. 1986), this Court addressed the issue of right to counsel at an inadvertent "show-up." Relying on United States v. Thevis, 665 F.2d 616 (5th Cir.1982), this Court held that there is no violation of right to counsel where the encounter was inadvertent and there was no evidence that the prosecutor staged it. Thompson at 692. Therefore, in the absence of any evidence that this incident was staged, Nicholson's Sixth Amendment right to counsel was not violated, assuming that this voice "overhearing" is even equivalent to a "show-up," since Ms. McKinion did not actually see Mr. Nicholson.
Mr. Nicholson next argues that this incident tainted Ms. McKinion's subsequent in-court identification of Mr. Nicholson. Again applying the Neil factors, Ms. McKinion had ample opportunity at the time of the crime to hear her assailant speak. She testified that he kept threatening to kill her if she told the police. According to the record, she immediately identified his voice when she overheard it, and the overhearing took place only four days after the crime. Therefore, there is substantial evidence that there was not substantial likelihood of irreparable misidentification in allowing the in-court identification, nor was there substantial likelihood of misidentification in allowing testimony of this out-of-court identification of Nicholson's voice.

D. The Voice "Lineup"

Mr. Nicholson argues that the voice "lineup" conducted at the police station on September 5 was permeated with taint and held in absence of his legal counsel. The procedure involved seven black men standing in an adjoining room with the door closed and speaking the same line through the door louvers. Mr. Nicholson was speaker # 4, who Ms. McKinion immediately identified as that of her assailant. The test was conducted a second time and immediately she identified his voice. She never saw Mr. Nicholson.
The initial question is whether such a voice lineup is equivalent to a corporeal lineup, which requires the protection of the right to counsel if that right has attached, where the witness sees the persons in the lineup and perhaps hears them speak. In U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the U.S. Supreme Court held that a corporeal pre-trial lineup *74 not capable of reconstruction at trial is a critical stage of criminal proceedings requiring aid of counsel for the defendant in order to "avert prejudice and assure meaningful confrontation at trial." Wade at 236, 87 S.Ct. at 1937. Wade specifically spoke to postindictment lineups where it was clear that criminal proceedings against a defendant had begun. We hold today that when the right to counsel has attached, this kind of voice lineup closely resembles the trial-like confrontation of a corporeal lineup amounting to a critical stage for which counsel should be present under Wade and its progeny and under York. Under the rationale of Wade, counsel's absence from a voice lineup forestalls effective cross-examination on this point to bring out any suggestive or prejudicial circumstances surrounding the voice lineup. Therefore, we analyze the voice lineup like a corporeal lineup.
The next question, then, is whether Nicholson's right to counsel had attached. Unlike the lineup in Wade, this voice lineup occurred before indictment, arraignment or preliminary hearing. It may have occurred before Nicholson was arrested. Unfortunately, the record is not clear on this point.
In Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the U.S. Supreme Court held that the right to counsel does not attach until such time as "adversary judicial proceedings have been initiated against him." Kirby at 688, 92 S.Ct. at 1881. Kirby indicates that the starting point of the "whole system of adversary criminal justice" is that point at which "[g]overnment has committed itself to prosecute... ." Kirby at 689, 92 S.Ct. at 1882. This point may be at formal charge, preliminary hearing, indictment, information, or arraignment, according to Kirby, implying that the states must determine, within the context of their criminal justice systems, how early that point will be.
Taking the earliest possible point in Mississippi as being arrest pursuant to warrant, if the voice lineup was conducted before Nicholson was arrested pursuant to warrant, his right to counsel claim is without merit. If, however, he was arrested pursuant to warrant at the time of the voice lineup, his right to counsel had attached. If the voice lineup was conducted in violation of Nicholson's right to counsel, testimony about the voice lineup identification would be inadmissible. Under Moore v. Illinois, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), "the prosecution cannot buttress its case-in-chief by introducing evidence of a pretrial identification made in violation of the accused's Sixth Amendment rights, even if it can prove that the pre-trial identification had a different source." Moore at 231, 98 S.Ct. at 466, citing Gilbert v. California, 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1966). Therefore, it would have been error for the trial court to allow the testimony into evidence. Under Moore and Gilbert this Court would next have to determine if beyond a reasonable doubt the admission of the testimony in this case would have constituted harmless constitutional error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman at 24, 87 S.Ct. at 828) Moore, 434 U.S. at 232, 98 S.Ct. at 466, Gilbert, 388 U.S. at 274, 87 S.Ct. at 1957. See also Cannaday v. State, 455 So.2d 713 at 724 (Miss. 1984).
The record in this case is unclear as to whether or not Nicholson was even under arrest at the time of the voice lineup. However, even if the voice lineup was conducted in violation of Nicholson's right to counsel, use of the voice lineup identification testimony at trial was harmless constitutional error. In so holding, we note that the voice lineup was not the first confrontation of the victim and defendant. Ms. McKinion had previously identified Nicholson as her assailant in a photo identification and an inadvertent voice showup, both of which she was able to make because of the substantial amount of time she spent in intimate contact with her assailant. Had this voice lineup been the first confrontation, and in violation of Nicholson's right to counsel, under the rationale of Moore and Gilbert, testimony of any subsequent pretrial *75 identifications would also have been inadmissible because of the possibility of exploitation of the initial illegality. See Moore, 434 U.S. at 231, 98 S.Ct. at 466, Gilbert, 388 U.S. at 273, 87 S.Ct. at 1957.
In a related matter, we note that even if the voice lineup had been conducted in violation of Nicholson's right to counsel, the in-court identification would still be permitted "upon a showing by clear and convincing evidence that the in-court identifications are based on observations of the suspect other than a lineup identification." York at 1383, citing U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). We hold that there was clear and convincing evidence that Ms. McKinion made her in-court identification of Nicholson based on her intimate observations of him for some three hours on the night of the crime, observations which she accurately gave to Officer Allen when he first spoke with her.
As to Nicholson's claim that the voice lineup was permeated with taint, there is no evidence on the record that Nicholson's voice was in any way singled out, pointed out, or suggested to Ms. McKinion. Nicholson's contention is without merit.
In summary, under our scope of review, we hold that there is substantial evidence to support the trial judge's suppression hearing findings that, under the totality of the circumstances, the identification testimony was not impermissibly tainted.

III. The Lower Court Erred in Requiring the Jury to Give a Numerical Division Pertaining to Their Being Deadlocked Regarding Their Reaching a Verdict of Guilt or Innocence of the Defendant After Having Gone Through Several Hours of Deliberations.
In his final assignment of error, Mr. Nicholson contends that the trial judge should not have asked the jury after two and one-half hours of deliberation what their numerical division was. The jury initially began their deliberations at 5:45 p.m. At 8:07 the judge brought the jury back in, and the following exchange took place.
Court: Now, listen to my question very carefully, Mr. Chisolm, and don't answer until I tell you to answer. Shortly, I will ask you as to your numerical division, and when I do ask you ..., I'll not want you to tell me a number for this and this many for this. All I want you to do is just give me an answer in numbers. Now what's your division?
Answer: Seven and five.
Court: I'm going to let you continue your deliberations. Mr. Bounds will furnish you, again, a clean sheet of paper and an envelope and I'll let you retire back to the jury room.
At 9:07 he again brought them back, whereupon the foreman explained that they were still seven and five. The judge recessed for the night and sequestered the jury. They returned to their deliberations the next morning at 9:17 a.m. and brought in a verdict at 1:01 p.m. Mr. Nicholson asks this Court to overrule its earlier decision in Sharplin v. State, 330 So.2d 591 (Miss. 1976). This we decline to do.
In Sharplin this Court stated that "the mere request and receipt of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error." Sharplin at 596. This Court has continued to follow its decision in Sharplin. See, e.g., Pace v. State, 473 So.2d 167 (Miss. 1985); Martin v. State, 415 So.2d 706 (Miss. 1982).
The trial judge in this case was very careful to warn the foreman of the jury not to tell him how many were for guilty or not guilty. He sent them back to deliberate further. The trial court's actions were well within the Sharplin guidelines and it did not commit reversible error.

CONCLUSION
The trial court committed no reversible error in Mr. Nicholson's case. Therefore, the conviction and sentence are affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and GRIFFIN, J., concur.
*76 ROBERTSON, PRATHER, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur by separate written opinion.
ROBERTSON, Justice, concurring:
As a matter of the law of this state, the right to counsel attaches once the accused is in custody (a fact generating the legal conclusion that the individual is under arrest) and all reasonable security measures (of evidence and persons) have been completed. At all critical stages thereafter, the accused is of right entitled to access to counsel, absent a specific knowing and intelligent waiver tied to that stage. These general premises, which I will explain below, derive from the most coherent and principled combined reading that may be given Miss. Const. Art. 3, § 26 (1890); Rules 1.02 through 1.05, Miss.Unif.Crim.R. Cir.Ct.Prac. (1979 as amended); Livingston v. State, 519 So.2d 1218, 1220 (Miss. 1988); Nixon v. State (Miss. No.DP-65, dec. November 25, 1987) (not yet reported); Williamson v. State, 512 So.2d 868, 876 (Miss. 1987); Tolbert v. State, 511 So.2d 1368, 1375 n. 5 (Miss. 1987); Page v. State, 495 So.2d 436, 440 (Miss. 1986); and Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984); cf. Miss. Code Ann. § 99-1-7 (1972).
Quite clearly, James Harvey Nicholson's right to counsel had attached well prior to the voice line-up in which he was required to participate on the afternoon of September 5, 1985. A bit of explanation is in order.
Nicholson was in custody at least as early as the evening of September 3, 1985. He had been in police custody at least forty consecutive hours prior to the voice line-up. This fact is primary, because of the synonymity of custody and arrest. A person is under arrest when by means of physical force or a show of authority his or her freedom of movement is effectively restricted. A person is under arrest when he is in custody and not free to leave. This proposition derives from Floyd v. State, 500 So.2d 989, 992 (Miss. 1986); Swanier v. State, 473 So.2d 180, 186 (Miss. 1985); Riddles v. State, 471 So.2d 1234, 1236 (Miss. 1985); see also Thornhill v. Wilson, 504 So.2d 1205, 1208 (Miss. 1987).[1]
Once an individual has been functionally arrested, Rule 1.02 requires that he be promptly taken before a magistrate, at which time he must promptly be offered counsel. "Forthwith" is the word used in the rule. Rule 1.02 clearly contemplates a warrantless arrest and requires appearance before a neutral judicial officer "upon completion of the arrest." This requires interjection of a judicial officer at the point after which the accused has been taken to the police station and sufficient time afforded to complete the formal charging and booking procedures and reasonable security measures.
Rule 1.04 must be added to Rule 1.02 to further define the term "forthwith." Rule 1.04 requires that any arrested person be taken before a neutral judicial officer "without unnecessary delay." Read in complement the two rules explicate "forthwith" to mean "without unnecessary delay." When custody, booking, administrative and security needs have been met, there is but one possible excuse for delay: lack of access to a judge. In assuring this fact, principled policy demands that the judge be considered just as accessible for the defendant's initial appearance as for procuring a search warrant in a felony investigation. The valid (state law) rules in the field read together prohibit law enforcement from taking advantage of the unavailability of a judicial officer to procure evidence or unfair advantage which would likely become inaccessible after initial appearance.[2] An uncounseled voice *77 line-up is something which, as a matter of common sense, would never (could never) be available once the accused has had his initial appearance and has been afforded access to counsel.
A major purpose of Rules 1.02 and 1.04 is to secure to the accused prompt ("forthwith", "without unnecessary delay") advice of his right to counsel by a judicial officer, one who has no professional duty nor personal inclination to try to exact from the accused a waiver of that right. Rule 1.05 directs that "counsel shall be appointed no later than the time of the initial appearance." This point in time is the "time the initial appearance under Rule 1.04 ... ought to have been held...." Page, 495 So.2d at 439.
Once the right has attached, it is available to the accused "at every critical stage" thereafter. See Rule 1.05, Miss. Unif.Crim.R.Cir.Ct.Prac. (1979). A critical stage is one where a substantial right may be affected. Critical stage includes every confrontation between the accused and law enforcement carrying the possibility of irremedial prejudice to the accused. Voice line-ups, such as that conducted on the afternoon of September 5, have been unanimously held "critical stages". United States v. Wade, 388 U.S. 218, 226-27, 87 S.Ct. 1926, 1932, 1937, 18 L.Ed.2d 1149 (1967); People v. Singleton, 83 Misc.2d 112, 370 N.Y.S.2d 359, 360-62 (1975); People v. Watkins, 55 Misc.2d 168, 284 N.Y.S.2d 365 (1967); People v. Thomas, 44 Mich. App. 649, 205 N.W.2d 604 (1973); United States v. Patton, 721 F.2d 159 (6th Cir.1983); Thomas v. Leeke, 393 F. Supp. 282, 286 (D.S.C. 1975); United States v. James, 496 F. Supp. 284 (W.D.Okla. 1977); State v. Best, 5 N.C. App. 379, 168 S.E.2d 433 (1969); People v. Reese, 121 Cal. App.3d 606, 175 Cal. Rptr. 214 (1981).
We may only conclude that the voice line-up was conducted in violation of Nicholson's right to counsel, as the record reflects both an absence of counsel and an absence of any waiver of counsel. Reversal, however, is not required. There is a sufficient showing in the record that the prosecuting witness McKinnon's in-court voice identification testimony was not impermissibly tainted by the voice line-up. Cf. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Ray v. State, 503 So.2d 222, 223-24 (Miss. 1986); York v. State, 413 So.2d 1372, 1374 (Miss. 1982). I join today's judgment of affirmance.
PRATHER, SULLIVAN, ANDERSON and ZUCCARO, JJ., join in this opinion.
NOTES
[1] Like theory derives from federal case law. Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983); United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497, 509 (1980).
[2] There is another principle that must be factored in. Mississippi law prohibits law enforcement authorities from holding an accused incommunicado where such detention may derogate his or her ability later to secure a fair trial. Ewing v. State, 300 So.2d 916, 919 (Miss. 1974); Scarborough v. State, 261 So.2d 475, 479 (Miss. 1972). Translated, police can't just hold someone without access to the outside world. Where a confession emanates from such detention, there is a serious admissibility problem even though Miranda warnings have been given.