ROBERTS, J.,
for the Court.
¶ 1. In June 2007, Johnny Wayne Wallace was convicted in the Circuit Court of Tate County of attempted armed robbery and conspiracy to commit armed robbery. Following the denial of his motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, Wallace now appeals and raises the following issues:
*435 I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE VICTIM TO MAKE AN IN-COURT IDENTIFICATION.
II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE’S REQUEST FOR WALLACE TO SHOW THE JURY HIS GOLD TEETH.
III. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO FIND WALLACE GUILTY.
Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On the night of September 9, 2004, Lacie Lloyd, Antonio Boyce, Marrieo Love, and Wallace were on their way to Ollie L. Buford’s home with the intent to rob him. According to Lloyd, the plan was to drop Boyce, Love, and Wallace off in front of Buford’s house and then come back in fifteen or twenty minutes to pick them up.[1] She did as she was told, and once Wallace, Love, and Boyce were dropped off, they knocked on Buford’s front door. According to plan, Love explained to Buford that his girlfriend left them stranded and asked if he could use the telephone. Love and Boyce testified that both Wallace and Boyce had guns when they went in Buford’s house. The plan further called for Love to ask Buford for money once they reached the telephone, which was upstairs, but when Buford escorted him to the telephone, he failed to do so. While they were upstairs, Boyce and Wallace waited downstairs. Love claimed that on the way back downstairs, Wallace asked him if he had gotten the money. When Love responded in the negative, Wallace pulled a pistol from his waistband and shot Buford. Love testified that at this point the three would-be robbers ran out the front door. However, this was the last time he saw Boyce that night.
¶ 3. When Lloyd returned, an ambulance was outside Buford’s house. When she stopped, Wallace and Love jumped in the car, but Boyce was nowhere to be found. Prior to dropping the trio off, Lloyd did not see a gun; however, after she returned, she noticed that Wallace had a gun. At the behest of her passengers, Lloyd drove away from the scene. While driving, Lloyd overheard Love and Wallace talking about the botched robbery. According to Lloyd, they were upset that they did not get any loot, and at one point, Wallace exclaimed that he “shot [Buford] at least four or five times.” At the end of the trio’s escape they ended up outside Love’s sister’s house on Smart Road. Love and Wallace got out of the car and walked over to a couch on the side of the house. Love lifted the couch, and Wallace placed the gun underneath it.[2]
¶ 4. After hiding the pistol, Lloyd, Love, and Wallace went to Boyce’s house, which is also on Smart Road, and waited for him to return. When Boyce did not show up, the trio went to Wallace’s aunt’s house. Love convinced Wallace that if his aunt would drive them to the Sardis police station, they would concoct a story and leave him out of it. Both Lloyd and Love testified that once they arrived at the police station, they told an officer that the man that shot Buford was outside in the car, referring to Wallace. During subsequent questioning by Tate County Sheriffs De *436 partment personnel, Love and Lloyd followed through on the plan to make up a story; however, both eventually told law enforcement of the plan to rob Buford and of Wallace’s involvement in it.
¶ 5. Chief Deputy Brad Lance with the Tate County Sheriffs Department was called to the scene of the crime on the night of the shooting. He processed Buford’s house for evidence and discovered multiple projectiles, fragments, and a casing. From his discussion with Buford and the first responders, Detective Lance determined that Love and an individual named “Steve” were involved in the shooting. Subsequently, Detective Lance interviewed Love. Although Love ultimately gave two versions of events, “Steve” was not mentioned in either. Detective Lance testified that Love eventually told him of the conspiracy among himself, Lloyd, Boyce, and Wallace. Additionally, Love led Detective Lance to where the pistol used in the shooting was hidden. It was later determined that the projectiles found in Buford’s home were fired from the pistol found under the couch. Detective Lance also interviewed Wallace. Although he admitted to being with Lloyd, Love, and Boyce on the night of September 9, 2004, Wallace denied any involvement in or knowledge of the robbery or the shooting.
¶ 6. Detective Lance also interviewed Boyce. Detective Lance stated that during that interview, Boyce admitted to being with everyone, but denied any knowledge of the robbery. He also claimed that he did not have a weapon that night. However, during his testimony at trial, Boyce testified that the plan was to rob Buford at gunpoint, and both he and Wallace had pistols. He stated that when Love and Buford came back downstairs, Wallace asked where the money was and then started shooting at Buford.
¶ 7. Buford testified to the events of that night as follows: He stated that he knew Love very well because he was a member of his church, participated in missionary work with him, and was his distant cousin. According to Buford, Love rang his doorbell on the night of September 9, 2004, and asked if he could make a telephone call because his girlfriend left him without a ride. Buford let him in, but Love was not alone. Two other individuals accompanied Love into Buford’s house. Buford knew one individual as Antonio Boyce, but he did not know the other man.
¶ 8. Once inside the house, Love again asked Buford to use the telephone. Less than a minute after the men arrived at his home, Buford escorted him to the upstairs telephone, while Boyce and Wallace sat in the living room downstairs. Buford stayed with Love as he made his telephone call and then escorted him back downstairs. On the way down, Love stated that he could not reach anyone. Buford explained that they could use his telephone to make another call, but he could not drive them anywhere. With that news, the trio began to leave; however, Buford’s guests were not done yet.
¶ 9. As they approached the front door, one of the men pulled a gun, shouted something that Buford did not understand, and began firing at Buford. As soon as he saw the weapon, Buford defensively put up his hand and attempted to flee the scene. However, Buford did not escape unscathed. He was shot a total of five times. Buford stated that he saw the man who shot him when the three men came into his house, and he identified Wallace as the shooter some time after the shooting and again at trial.[3] Buford received medical *437 treatment and was released from the hospital the following evening.
¶ 10. Buford remembered speaking to a police officer while waiting on an ambulance, but stated that he was “out of it” that night as a result of the events that took place and his injuries. Nevertheless, Buford testified that he told an officer that a man named “Steve” shot him. However, Buford clarified that he referred to Wallace when he identified “Steve” as his assailant. Buford stated that he distinctly-remembered that Wallace had gold teeth; however, during the investigation, he was unable to give other specifics.
¶ 11. Wallace, along with Boyce, Lloyd, and Love, were indicted for conspiracy to commit armed robbery, armed robbery, and aggravated assault. Boyce and Love subsequently pled guilty to attempted armed robbery, and Lloyd pled guilty to conspiracy to commit armed robbery. Wallace’s first trial ended in a hung jury. Wallace’s second trial began in June 2007. At the conclusion of his second trial, the jury found him guilty of conspiracy to commit armed robbery and armed robbery, but not guilty of aggravated assault. The trial court subsequently sentenced Wallace to a five-year term of imprisonment on his conviction for conspiracy to commit armed robbery and a twelve-year term of imprisonment on his conviction for armed robbery, all in the custody of the Mississippi Department of Corrections. The trial court further ordered that the above sentences were to run consecutively to each other, but concurrently to a sentence Wallace was currently serving in the State of Wisconsin for a conviction of intimidating a witness. Following the denial of Wallace’s motion for a new trial or, alternatively, a judgment notwithstanding the verdict, he now appeals his conviction.
ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE VICTIM TO MAKE AN IN-COURT IDENTIFICATION.
¶ 12. Prior to trial, Wallace filed a motion to suppress Buford’s out-of-court identification and potential in-court identification of Wallace. At the conclusion of a hearing on the issue, the trial court noted the factors established by Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and held that any mention of the out-of-court identification would be improper, but the trial court found that the photograph of Wallace was not impermissi-bly suggestive as to taint an in-court identification. Additionally, the trial court held that the State would be allowed to question Buford as to the general description of his shooter and whether he could identify Wallace as the shooter. Wallace argues that the trial court erred in determining that the out-of-court identification was not so impermissibly suggestive so as to preclude Buford from making an in-court identification.
¶ 13. In making the determination as to the reliability of the out-of-court identification, a trial court must employ the Biggers factors, which include:
a. the opportunity of the witness to view the criminal at the time of the crime;
b. the witnesses] degree of attention;
c. the accuracy of the witnesses] prior description of the criminal;
d. the level of certainty demonstrated by the witness at the confrontation; and
e. the length of time between the crime and the confrontation.
*438 McDowell v. State, 807 So.2d 413, 418-19(¶ 12) (Miss.2001) (citing Biggers, 409 U.S. at 199, 93 S.Ct. 375). The supreme court has stated that “an impermissibly suggestive pre-trial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure unless: (1) from the totality of the circumstances surrounding it, (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” Lattimore v. State, 958 So.2d 192, 199(¶ 16) (Miss.2007) (quoting Nicholson v. State, 523 So.2d 68, 72 (Miss.1988)). After viewing the totality of the circumstances, “[w]e will support a trial court’s finding that an in-court identification was not tainted unless there is no substantial credible evidence supporting such a conclusion.” Id. (citing Outerbridge v. State, 947 So.2d 279, 282(¶ 8) (Miss.2006)).

A. Opjooriunity to View the Accused

¶ 14. Buford testified that he saw all three individuals who came into his home that night, Love, Boyce, and Wallace, when they entered his illuminated living room. However, it was for less than a minute. Buford further stated that as the men began to leave, he was able to see Wallace again. He testified that he saw Wallace draw1' his gun and begin shooting.

B. Buford’s Degree of Attention

¶ 15. Buford testified that he knew Love well, and he recognized Boyce. He further stated that he did not know who Wallace was at the time, but he immediately noticed Wallace’s distinctive gold teeth. Therefore, it is not unreasonable to infer that Buford’s attention would have been drawn more to an individual he did not know who had distinctive dental work.

C. Accuracy of Buford’s Prior Description of the Accused

¶ 16. Buford was unable to give law enforcement any description of his shooter on the night of the attack other than that his attacker was a black male. Although, during the suppression hearing, Buford testified that the shooter was shorter than the other two men. Additionally, he stated that the man who shot him was named “Steve”; however, he clarified at trial that he was referring to Wallace as the person he thought was named Steve.

D. Buford’s Level of Certainty at the Confrontation

¶ 17. Exactly how Buford came to see the photograph of Wallace is unclear, as Detective Lance’s and Buford’s version of events were quite different. According to Detective Lance, several days after the shooting, he visited Buford at his place of employment. Buford identified Wallace as the shooter. Detective Lance explained that he went to Buford’s place of business that day in an attempt to rule out a “Steve” who had surfaced during the investigation. He stated that Love and Boyce had already identified Wallace as the shooter, but Detective Lance wanted to show Buford a picture of Steve Mang-rum to rule him out. He intended on showing Buford only one photograph of Mangrum; however, when Detective Lance opened the file folder containing the picture, Buford saw a picture of Wallace and identified him as the shooter. Detective Lance stated that he had several photographs, but they only depicted Wallace and Mangrum. Additionally, Detective Lance testified that he never laid out any photographs.
¶ 18. According to Buford, Detective Lance showed him three to five photographs. Buford stated that he could not recall the incident very clearly, but he *439 thought that it was approximately five or six months after the shooting when Detective Lance came to his shop, laid out several photographs of different people on a counter, and told him, “we think we’ve identified the shooter.” Buford stated that once he saw “the facial structure and the gold that he had in his mouth,” he identified Wallace’s picture.

E. Length of Time Between the Robbery and the Confrontation

¶ 19. As noted above, Buford stated that he identified Wallace approximately five to six months after the shooting, while Detective Lance claimed that it occurred several days after the shooting. However, regarding any taint that may have accompanied Buford’s photo identification of Wallace, we note that Buford’s in-court identification occurred approximately two years later.
¶ 20. Based upon the totality of the circumstances, we find that the trial court did not err in allowing Buford to make an in-court identification of Wallace. This issue is without merit.
II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE’S REQUEST FOR WALLACE TO SHOW THE JURY HIS GOLD TEETH.
¶21. The entirety of Wallace’s second argument states as follows:
The State requested that the Appellant be required to open his mouth and show his teeth to the jury. Appellant objected. Appellant concedes that the existing law according to Porter v. State, 519 So.2d 1230 (Miss.1988), states that compelling a [defendant to show a body characteristic does not violate his right against self[-]incrimination[,] and this ruling has been affirmed in numerous other cases.
¶ 22. Although Wallace raises this issue on appeal, he simultaneously concedes that it is without merit. We agree.
III. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO FIND WALLACE GUILTY OF ATTEMPTED ARMED ROBBERY.
¶ 23. While Wallace’s third argument is titled, “whether the verdict was against the overwhelming weight of the evidence or the evidence was insufficient to support the verdict,” he only argues that the evidence against him was insufficient to satisfy the elements of armed robbery. Specifically, he claims error only for the trial court’s denial of his motion for a judgment notwithstanding the verdict, and concludes his argument by stating, “[a]p-pellant contends that the armed robbery count should be reversed and rendered due to the fact that there was no testimony that Buford was placed in fear.” Therefore, we will restrict our review to the sufficiency of the evidence presented at trial against Wallace.
¶ 24. A motion for a directed verdict and a motion for a judgment notwithstanding the verdict both question the sufficiency of the evidence. Bush, v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005). On review of a trial court’s denial of such motions, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test[,] it is insufficient to support a conviction.’ ” Id. (citing Carr v. State, 208 So.2d 886, 889 (Miss.1968)). That is not to say that this Court should ask itself whether it agrees with the conclusion of guilt; rather, the inquiry is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational *440 trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (citing Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 25. If, after reviewing the facts presented at trial under the above standard, we find that “reasonable men could not have found beyond a reasonable doubt” every element of the charged offense, our proper course of action is to reverse and render the case. Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). However, if the reverse is true, and at the conclusion of this Court’s review of the evidence we find that “reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the sufficiency of the evidence will be deemed satisfactory, and the conviction will stand. Id. (quoting Edwards, 469 So.2d at 70).
¶ 26. Wallace’s amended indictment alleged, in part, that he:
willfully, unlawfully!,] and feloniously, [took] or attempted to take from the presence or person of Ollie Buford certain personal property, to wit: cash money, being the personal property of Ollie Buford, against the will of Ollie Buford, by putting Ollie Buford in fear of immediate injury to his person by the exhibition of a deadly weapon, to wit: a pistol....
(Emphasis added). The jury subsequently returned a verdict against Wallace finding him guilty of attempted armed robbery. In order for the jury to return such a verdict, they must have found beyond all reasonable doubt that the evidence presented against Wallace satisfied the elements of Mississippi Code Annotated section 97-3-79 (Rev.2006), which states:
[e]very person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....
(Emphasis added). As is evident from the portion of the indictment quoted above, the State limited the charge against Wallace to only include the element of fear of immediate injury. As noted above, Wallace argues that there was insufficient evidence to support the jury’s implied finding that Buford was put in fear of immediate injury so as to satisfy that element of armed robbery. However, “[i]t is well settled in Mississippi that an attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission.” Spann v. State, 771 So.2d 883, 891(¶ 18) (Miss.2000).
¶ 27. We find that the facts of this case satisfy the elements of an attempted armed robbery. Regarding the requisite intent, Wallace discussed robbing Buford and developed a plan to do so. He then concealed a weapon prior to entering Buford’s home. Regarding an overt act, once Wallace discovered that Love failed to complete the robbery, he brandished his weapon, which caused Buford to run in fear, and then shot him. The jury could have easily inferred that the only reason that the robbery was not completed was because Wallace’s cohorts fled the scene once the shooting began.
¶ 28. The supreme court faced a similar set of circumstances in Spann. In Spann, three individuals decided to go to a convenience store to “get cigarettes, and ... rob the store.” Spann, 771 So.2d at 891(¶ 18). Two of the robbers, including Spann, armed themselves, masked their faces, and entered the store. Id. Spann *441 and his accomplice then opened fire on the two clerks inside, killing one and injuring the other. Id. at 886-87(¶ 2). All three robbers immediately fled the scene as a customer simultaneously drove up. Id. at 887, 892 (¶¶ 2, 20). Spann was found guilty of capital murder with the underlying crime being armed robbery. Id. at 888(¶ 7). The supreme court affirmed the jury's verdict, holding that the facts above satisfied the elements of armed robbery and that the jury was “free to infer that the only reason no robbery was consummated was that [the customer] entered the parking lot.” Id. at 892(¶ 20).
¶ 29. Additionally, the supreme court upheld a conviction for armed robbery in Greenwood v. State, 744 So.2d 767, 771(1121) (Miss.1999). There, Greenwood exclaimed that while he and a friend were riding around Madison County, he was talking about robbing John Axtell. Id. at 770(¶ 9). His plan was to knock on Ax-tell’s door and place a gun to his head when he opened the door; however, when Axtell answered the door, Greenwood only stated that his car was out of gasoline and asked Axtell if he could borrow some gasoline. Id. The State introduced a statement made by Greenwood in which he admitted that after leaving Axtell’s doorstep, he eventually threw a rock through a plate glass door and shot Axtell through a window. Id. at 770(¶ 10). Once Axtell realized he had been hit with a projectile, he retrieved his rifle and returned fire. Id. at 769(¶ 3). At this point, Greenwood and his cohorts fled the scene. Id. The supreme court found that although Greenwood did not carry out his plan to rob Axtell while holding him at gunpoint, his actions were clearly sufficient overt acts to support his conviction. Id. at 770(¶ 11). The supreme court noted that the jury was free to infer that the only reason no robbery was consummated was because the victim returned gunfire. Id.
¶ 30. In the instant case, Lloyd, Love, and Boyce all testified that they, including Wallace, talked about robbing Buford well before they arrived in front of his house. They developed a plan in order to effectuate their collective intent that included Lloyd dropping the trio off close to Buford’s home and gaining access to Buford’s home by telling him that Love’s girlfriend abandoned them. Their plan worked, and on the night of September 9, 2004, Love, Boyce, and Wallace entered Buford’s home with the intent to rob him. Both Boyce and Wallace had pistols to facilitate their intent. Once inside, Love asked to use the telephone; however, he did not go through with the plan to rob Buford.
¶ 31. As he and Buford headed back downstairs, Wallace asked, “did you get the money?” When Love said “no,” Wallace removed his pistol from his waistband and began firing at Buford. Buford stated that he then “began to turn and run. And I guess I throwed [sic] up this hand and that’s when he shot me though this finger here. And then he began, you know, continually shooting.” Buford further stated, “[w]ell, after I then, you know, I just ran to dodge the bullets. And I ran back up into the den area[,] and I fell over the coffee table.” On cross-examination, he reiterated his testimony by saying, “[h]e stated some type of words and when I seen [sic] the gun I just, you know, turned to flee from the gun. That’s when he began shooting.” Boyce and Love also ran at the sound of the gunshots. Considering all of the evidence in the light most favorable to the prosecution, it cannot be said that reasonable and fair-minded jurors could not find that Wallace had attempted to commit the crime of armed robbery.
¶32. As in Spann and Greenwood, there is abundant proof that Wallace possessed the intent to rob Buford by placing *442 him in fear through the exhibition of a deadly weapon. Further, similar to Spann entering the convenience store with his face masked and carrying a gun, and Greenwood knocking on Axtell’s door and subsequently shooting him through a window, Wallace’s actions of entering Buford’s home with a concealed pistol and shooting him once he learned that Love failed to complete the robbery more than satisfied the requisite showing of an overt act in furtherance of his intent to rob Buford. It is only because of his accomplices’ apparently unexpected flight, and Buford’s survival instincts, that Wallace was unable to complete the armed robbery. Thus, we find that this issue is without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF TATE COUNTY OF CONVICTION OF COUNT I, CONSPIRACY TO COMMIT ARMED ROBBERY, AND SENTENCE OF FIVE YEARS, AND COUNT II, ATTEMPTED ARMED ROBBERY, AND SENTENCE OF TWELVE YEARS, WITH THE SENTENCE IN COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND WITH SENTENCES IN COUNTS I AND II TO RUN CONCURRENTLY WITH A FIVE-YEAR SENTENCE IN THE CUSTODY OF THE WISCONSIN DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TATE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.

. Lloyd stated on cross-examination that during her guilty plea hearing she told the trial court that she did not know that a robbery was planned.

. During a previous hearing, Love testified that he was not sure who was driving the night of the shooting. Additionally, he previously testified that he was unsure who put the pistol under the couch.