# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01623-SCT

*KALE SCOTT a/k/a KALE RASHAUD SCOTT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/27/2015 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | FORREST ALLGOOD |
| | SCOTT WINSTON COLOM |
| | RODNEY A. RAY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RODNEY A. RAY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/29/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., COLEMAN AND MAXWELL, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Kale Scott was indicted for one count of aggravated assault, in violation of Section

97-3-7 of the Mississippi Code, and one count of murder, in violation of Section 97-3-19.

Scott appeals the verdict of a Lowndes County jury, which found him guilty on both counts.

Finding no error, we affirm his convictions and sentences.

## STATEMENT OF THE FACTS AND PROCEDURE BELOW

¶2.     On the evening of May 22, 2014, Scott attended a high school graduation party at the Lowndes County fairgrounds in Columbus, Mississippi.  Approximately two hundred guests were in attendance. During the party, Frederick Smith was shot in the leg, and Devin Montgomery, who was shot five times in the back to the posterior of his body, succumbed to his injuries and died. Scott admitted he was the shooter.

¶3.     During the trial, Jomoco "Ken" Harriston testified that he was working as a security guard for Robinson Security the night of the graduation party. Harriston witnessed a fight break out near the stage between Scott and Montgomery. Harriston broke up the fight[1] and then began escorting Scott toward the entrance of the building. Before he could get Scott out of the building, Harriston heard another fight break out behind him. Harriston let Scott go and went back to the same area where the original fight had occurred. Montgomery was involved in the second fight, so Harriston began to walk Montgomery to the entrance of the building. As Harriston was escorting Montgomery, Scott stepped out of a nearby crowd. Harriston estimated that Scott was about eight feet in front of Montgomery. Harriston testified that Montgomery was not attacking or threatening Scott in any way. Scott spoke to Montgomery, but Harriston testified that he and Montgomery continued walking, paying Scott no attention. Harriston then heard a "pow" and saw Montgomery jump, run away, and collide with a table. Harriston testified that it was extremely loud in the building because the speakers were still blaring. He heard only one shot. After Montgomery hit the table, Harriston saw him get up and run toward the exit, before Montgomery finally stopped, leaned

---

[1] He testified that neither Scott nor Montgomery looked seriously injured.

2

against a wall, and slid down, leaving a trail of blood. Harriston ran out of the building to call 911.

¶4.     Harriston testified that he never saw Scott with a gun, but he did see Scott tuck something into his front waistband after the shots were fired. Harriston never saw Montgomery or anyone else with a weapon.

¶5.     Diesha Walker testified that she was on the staircase of the stage when the first fight broke out. Montgomery was standing on the floor, leaning up against the stage. Scott was standing on the stage behind Montgomery below. Scott accidentally spilled his beer on Montgomery while he was dancing on stage. Montgomery told Scott to "chill out."  Scott spilled his beer again before Montgomery grabbed Scott off the stage.  Walker saw Harriston break up the fight and walk off with Scott. Walker testified that another man, Deandra Buck, hit Montgomery, and the two started fighting. Walker testified that she saw Scott reappear and pull out a gun and shoot. Walker stated that Scott appeared to hesitate after the first shot, but he continued shooting. Walker testified that at the time of the shooting, Montgomery was not a threat to Scott. Walker never saw Montgomery or anyone else with a weapon.

¶6.     Fredrick Smith, Montgomery's cousin, testified that he saw both fights involving Montgomery. When the security guard came to break up the second fight and take Montgomery away, Smith stayed behind and confronted the person who had been fighting Montgomery (Buck). As Smith was questioning Buck, he saw a man with a gun in his hand approaching him from the right. Smith then saw the man fire the gun. Smith testified that he heard four or five gunshots.

3

> As I hear the first shot, I took off running. As I took off running on the side of me, I noticed Devin [Montgomery]. He's running on side of me as well. I hear another shot. That's when I noticed – well, that's when I noticed I was hit in the leg. I noticed I had got shot.

> As I got shot, I seen Devin fall. Well, I picked him up by his pants' leg. And we proceeding to run. As we're proceeding to running, I'm steady hearing gunshots go off. And I'm pushing people behind me or what not. But I'm steady hearing gunshots the whole time I was running.

Smith testified that he was shot in the back of his right thigh. Smith identified Scott as the shooter.

¶7.    Dr. Erin Barnhardt, deputy chief medical examiner at the Mississippi State medical Examiner's Office, was accepted as an expert in the field of forensic pathology. She testified that Montgomery had suffered five gunshot wounds[2] and had died as a result of his injuries. Barnhardt testified that Montgomery had been at least three feet away from the shooter when he was shot.

¶8.    Kevin McCrary, a law enforcement officer with the Columbus Police Department, testified that the weapon used in the shooting was never recovered. After interviewing Harriston and Walker, who both identified Scott as the shooter, McCrary began looking for Scott but was unsuccessful. Two days after the shooting, Scott turned himself in to the police. McCrary testified that Scott neither had any noticeable injuries nor complained of any injuries and was not in need of medical attention.

¶9.    After the State rested, Scott moved for a directed verdict, which was denied.

---

[2] Montgomery was shot in the right forearm, the back of his right upper arm, the right side of his back, his right and left buttocks, and the back of his left arm.

¶10. Bernice Willis, Scott's grandmother, testified that she had noticed several knots and bruises on Scott's head immediately before he turned himself in to the police. She testified she did not notice these bruises on the afternoon of the graduation party. Willis agreed that she had not seen him between the party and when he turned himself in and that she did not know when he may have received the knots and bruises.

¶11. Shareka Tillman, a chaperone at the party, testified that when she first saw Scott at the party he appeared normal and she did not see him with a gun. After she heard commotion from the fight and then gunshots, she saw Scott standing in the middle of the floor. When she approached him, she saw he had knots on his head and appeared in a daze. He would not answer any of her questions about what had happened.

¶12. Scott testified on his own behalf. He said he was at the graduation party with Buck and another friend. After Scott had entered the party, a friend of his told him he needed to get his cigarettes out of Scott's car. Scott left the party, got the cigarettes, and came back inside. Scott testified that, while he was on the stage with two girls, Montgomery grabbed his leg and wanted to talk to him. Scott pushed away from Montgomery, but Montgomery pulled him off the stage, and the two began fighting. Montgomery then hit Scott on the shoulder, grabbed him by the pockets, and started going through his pockets. Scott testified that Montgomery pulled his shirt over his head and was hitting him in the head. Other people also started hitting Scott in the head. Scott said at that point "[he] lost it" and started shooting.

Q. So, you said you lost it. Describe what happened then?

5

A. I lost it where really from the lick – from the hits of my head, I was really dazed like. I didn't know – I didn't know what I was doing. I didn't know what I was doing, sir.

Q. Did you in fact start shooting the gun?

A. Yes, sir.

Q. Do you know how many times you shot it?

A. I don't know how many times I shot, sir. I couldn't say.

Scott testified that, after the shooting, one of his friends had to drive him to his cousin's house, because he "wasn't 100 percent able to drive." Buck gave the gun to Scott's cousin. Scott did not call any of his family to let them know where he was until Sunday, when his family told him to meet them at the police station.

¶13. Scott testified that he brought a gun to the party because he had been picked on for many years, but he did not intend to harm anyone. He testified that he never intentionally aimed the gun at either Montgomery or Smith. Scott said that he was scared of Montgomery because he had experienced several bad encounters with Montgomery.

¶14. On cross-examination, Scott testified that he did not know why the two girls on the stage with him the night of the shooting were not at the trial to corroborate his story. He agreed that it was irresponsible to shoot a gun in a crowded room. Scott testified that he did not remember being removed from the fight by Harriston or that there was a subsequent fight between Buck and Montgomery.

6

¶15.    The State also introduced a number of tweets that had originated from Scott's account. Most of the tweets were about shooting people and homicide. Scott testified that many of the tweets were song lyrics but that he did mean some of them.

¶16.    The State called several rebuttal witnesses. Buck testified that when he heard gunshots, he ran to Scott's car. Buck testified that Scott drove and that he was acting normally and was not dazed. Scott dropped Buck off at his house, and then Scott drove away.

¶17.    Angela Williams testified that both Scott and Montgomery were at her house almost every day. However, she said, Montgomery never picked on Scott while at Williams's house.

¶18.    Cortney Williams, Montgomery's best friend and Scott's cousin, testified that he did not see the fights, but he talked to Montgomery immediately after they occurred. Williams recalled that he was approximately five feet away from Montgomery when he first heard the gunshots. Both men started running to exit.

> Q.     . . .What did you see while you were running?
>
> A.     Kale and D [Montgomery] – well D was saying – I asked D like – because at first he was walking like he was saying he got hit in the arm. And I was like who shot you? He was like Kale.
>
> Q.     All right. What did you see? Did you see Kale at all?
>
> A.     Yes, sir.
>
> Q.     Where was Kale Scott?
>
> A.     In the middle of the floor.
>
> Q.     What was he doing when you saw him?
>
> A.     Holding the gun.

Williams testified he never saw anyone else with a weapon that night.

¶19. The State finally rested, and the Lowndes County jury found Scott guilty of both aggravated assault and murder. As to Count I, Scott was sentenced to a term of twenty years, with ten suspended, and five years' post-release supervision. As to Count II, he was sentenced to a term of life imprisonment. The sentences are to be served consecutively.

¶20. Scott filed separate motions for Judgment Notwithstanding the Verdict of the Jury (JNOV) as to each count, alleging that the jury verdict was against the overwhelming weight of the evidence, *inter alia*. Both motions were denied. Scott timely filed his appeal.

## STATEMENT OF THE ISSUES

I.   **WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION OF THE JURY.**

II.  **WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

## ANALYSIS

### I.   There was sufficient evidence to sustain the conviction of the jury.

¶21. The standard of review for the legal sufficiency of the evidence is as follows:

> this Court will reverse and render only if the facts and inferences "'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' . . . ." The evidence will be deemed sufficient if "'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' . . . ." The relevant question is whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

> This Court considers the evidence in the light most favorable to the state. The state receives the benefit of all favorable inferences that may reasonably be drawn from the evidence.

*Hardy v. State*, 137 So. 3d 289, 303-04 (Miss. 2014) (quoting *Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008) (internal citations omitted)).

¶22. Scott argues that the evidence presented was insufficient to support the guilty verdicts because the State failed to establish that he was not acting in self-defense. Scott contends that his testimony proved that he had been struck in the head several times and began firing his gun to stop the attack.

¶23. When the evidence was viewed in the light most favorable to the State, there was more than sufficient evidence to support the jury's guilty verdict. Scott was indicted for murder pursuant to Section 97-3-19 of the Mississippi Code, which reads that "[t]he killing of a human being without the authority of law . . . when done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder. . . ." Miss. Code Ann. § 97-3-19 (Rev. 2014).

> Deliberate has been defined as "full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences." Design has been defined as "to calculate, plan, contemplate." Deliberate design "may be formed very quickly, and perhaps only moments before the act of consummating the intent."

*Bowser v. State*, 182 So. 3d 425, 430 (Miss. 2015), *reh'g denied* (Jan. 28, 2016) (quoting *Jones v. State*, 39 So. 3d 860, 865-66 (Miss. 2010)). Scott also was indicted for one count of aggravated assault pursuant to Section 97-3-7, which reads that "[a] person is guilty of aggravated assault if he . . . (ii) attempts to cause or purposely or knowingly causes bodily

injury to another with a deadly weapon or other means likely to produce death or serious bodily harm. . . ." Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2014)

¶24. Testimony from several witnesses evinced that Montgomery was trying to run away from Scott and posed no threat when he was shot from behind. Although Scott's testimony contradicts this version of events, his testimony was not sufficient to convince the jury that he was acting in self-defense.

¶25. The jury is allowed "to draw reasonable inferences from facts based on experience and common sense." *Howell v. State*, 860 So. 2d 704, 739 (Miss. 2003). Further, "the jury is the sole judge of the credibility of witnesses, and the jury's decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." *Nicholson v. State*, 523 So. 2d 68, 70 (Miss. 1988). In this case, the evidence supported the State's theory that Montgomery was trying to leave the venue and did not engage with Scott when Scott shot Montgomery five times and shot Smith once. Furthermore, there was testimony that Scott was not as severely beaten as he testified, nor was he so dazed and confused that he could not drive his car after the shooting. Ultimately, the jury decided that there was sufficient evidence to support both guilty verdicts and refute Scott's claim of self-defense. This issue is void of merit.

**II.     Whether the verdict was against the overwhelming weight of the evidence.**

¶26. When considering a challenge to the weight of the evidence, we review the evidence in the light most favorable to the verdict.  *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997).  "[W]e will only disturb a verdict when it is so contrary to the overwhelming weight

10

of the evidence that to allow it to stand would sanction an unconscionable injustice." ***Bush v. State***, 895 So. 2d 836 (Miss. 2005) (citations omitted).

¶27.    Scott argues that allowing his conviction to stand would sanction an unconscionable injustice because the evidence shows that he did not have the intent required for murder. He claims that he did not initiate any confrontation, he tried to remove himself from the fight, and Montgomery struck him first. He also argues that two witnesses testified that, immediately before the shooting, Scott had no injuries, and immediately after, he had several bruises and knots on his head.

¶28.    No witness corroborated Scott's testimony that he was severely beaten and shot his gun only to stop the attack. All other witnesses testified that Montgomery was unarmed and on his way to the exit when he was approached by Scott. Several witnesses watched Scott return to the area of the fight after he had been escorted away by Harriston. Montgomery's injuries prove that he was shot in the back from a distance of at least three feet.

¶29.    Scott testified that he waited two days to turn himself in to the police, choosing to remain at a cousin's house without alerting even his family as to where he was staying. Scott also testified he gave his cousin the weapon after the shooting. The jury, tasked with determining witness credibility, found Scott guilty, and its guilty verdict is supported by the overwhelming weight of the evidence. This issue is void of merit.

## CONCLUSION

¶30.    Scott's conviction and sentence are affirmed, as both were supported by convincingly sufficient evidence and were not contrary to the overwhelming weight of the evidence.

¶31. **AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**