# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-KA-01724-SCT

*BRIAN R. TURNER a/k/a BRIAN RUSSELL*
*TURNER a/k/a BRIAN TURNER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2019 |
| TRIAL JUDGE: | HON. KELLY LEE MIMS |
| TRIAL COURT ATTORNEYS: | RAYMOND G. O'NEAL, III |
| | KYLE DAVID ROBBINS |
| | JOHN DAVID WEDDLE |
| | ANDREW W. STUART, II |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANDREW W. STUART, II |
| | ADAM G. PINKARD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOHN DAVID WEDDLE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/17/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     On September 23, 2019, Brian Turner was found not guilty of one count of aggravated assault upon a law-enforcement officer (Count I) and was convicted of one count of failing to stop a motor vehicle pursuant to the signal of a law-enforcement officer (Count II), two counts of aggravated assault upon a law-enforcement officer (Counts III and IV) and one

count of possession of a firearm by a felon (Count V). Turner now appeals his convictions and the circuit court's denial of his Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial (J.N.O.V. Motion). Finding each of Turner's assignments of error to be without merit, we affirm Turner's convictions and the circuit court's denial of the J.N.O.V. Motion.

## FACTS AND PROCEDURAL HISTORY

¶2. On May 3, 2018, Mississippi Highway Patrol Trooper Derek Earnest, along with Officers James Guthery and Randy Cornelison of the Belmont Police Department and Tishomingo County Sheriff's Deputy Jason Moore, established a safety checkpoint in North Belmont, Mississippi. Two of the law-enforcement vehicles had their blue lights illuminated, while Officer Guthery's vehicle was not illuminated. Officer Guthery testified that "[e]verybody that [came] through [the roadblock] stop[ped]." At one point, Trooper Earnest "noticed a vehicle coming northbound that abruptly stopped . . ." and "darted into an old parking lot, . . . and went the other direction quickly without any regard to traffic that might have been going that direction." Trooper Earnest testified that the vehicle did not use a turn signal and that "there was . . . no tag light."

¶3. Deputy Moore testified that the vehicle turning around was unusual because "[m]ost people do not turn around prior to a safety checkpoint." Deputy Moore then followed the vehicle and observed that "[t]he vehicle did not have any tag lights" and that when he ran the plates, "the tag was expired." Deputy Moore, deciding to initiate a traffic stop while following the vehicle, turned on his blue lights. The truck pulled over, and Deputy Moore

2

got out of his vehicle and approached the truck. Immediately after opening his door and stepping out of the vehicle, Deputy Moore observed "the driver . . . hollering and yelling and extremely irate." At trial, Deputy Moore identified Turner as the driver of the truck.

¶4. Once Deputy Moore reached Turner, he asked for his license. With Turner still "irate," Deputy Moore requested an additional unit at his location. Deputy Moore asked Turner to exit the vehicle, drew his taser and "told him to turn around and place his hands behind his back" since Deputy Moore intended to "arrest him for disorderly conduct based off of his behavior." Deputy Moore testified that Turner then "said, *F this*, and he got back in his truck, and we started a short pursuit north toward the cemetery." Deputy Moore also testified that he had reasonable suspicion to believe that Turner committed traffic violations by having no tag lights and an expired tag, and he testified about Turner's disorderly conduct following the traffic stop.

¶5. As the chase reached County Road 35, Turner turned to go across a bridge that was closed. Turner "did a doughnut back to the – back this way and came back at [Moore] in a head-on manner." After Deputy Moore veered to avoid a wreck, Deputy Moore's and Turner's vehicles collided. Deputy Moore forced his driver-side door open and began to approach Turner's truck. Around that time, Officer Guthery arrived, and Deputy Moore heard Officer Guthery giving Turner the following verbal commands: "*Show me your hands. Drop the gun.*" Deputy Moore then heard gunfire and began "shooting for self-defense."

¶6. Officer Guthery testified that he then approached Turner's vehicle with his flashlight and weapon out. Officer Guthery, after yelling at Turner to get out of the truck, saw a "rifle

3

come up." Officer Guthery "yelled for him to put the gun down," and "[h]e rocked towards [Officer Guthery] with it, and then [Officer Guthery] opened fire." Officer Guthery testified that he fired his duty weapon first. Deputy Moore testified that he was in fear for Officer Guthery's life as well as his own. After running for safety nearby, Deputy Moore observed Turner point and fire a rifle at him, at which point Deputy Moore fired approximately eight more rounds. Turner fled the scene of the shooting in the truck, heading south on County Road 35.

¶7. Investigator Mitchell of the Tishomingo County Sheriff's Office heard the gunfire from his home nearby and arrived at the scene shortly after Turner fled. Once on the scene, Investigator Mitchell found shell casings of different calibers and bullet holes in the Belmont patrol car and damage to Deputy Moore's patrol unit. Investigator Mitchell also took photographs of the vehicles at the scene and measured distances between the vehicles. Officer Rodney Belue from Red Bay, Alabama, who was near the scene, helped investigate. Agent Keith Woodruff of the Mississippi Bureau of Investigation assisted in the investigation as well. Turner was later arrested in Tennessee without incident.

¶8. On October 9, 2018, Turner was indicted by a grand jury for one count of failure to stop, three counts of aggravated assault of a law-enforcement officer and one count of felon in possession of a firearm. On January 22, 2019, Turner filed a Motion for Dash Camera and Body Camera Surveillance, seeking an order directing the State to produce

> a copy of any and all audio, video, digital or electronic copy of any type of audio or video recording that was made by the Mississippi Highway Safety Patrol, the Belmont Police Department, and or the Tishomingo County Sheriff, or his deputies, to include, but not limited to, the dashboard camera footage

4

from the aforementioned police patrol cars, or any other police patrol car, at the time in question, together with body camera footage from any officer involved herein, to include: Trooper Derek Earnest, Tishomingo Deputy Jason Moore, Belmont Officer James Guthery, and Belmont Officer Randy Cornilson.

Turner alleged that all three law-enforcement agencies have and use body cameras and dash cameras. At the hearing on the same motion, the circuit court ordered the State

to provide all evidence, including dash cam video, that they have in their possession or through reasonable means of investigation can uncover. . . . I am ordering that the State make available any and all *Brady*[1] material, and you'll have an opportunity to cross-examine any and all witnesses that you wish to call at the appropriate time.

¶9.    On January 23, 2019, Turner additionally filed a motion to suppress "any evidence that was allegedly seized, as a result of the mentioned illegal search and seizure and arrest, of Defendant and rule the same inadmissible as to the Defendant . . . ." The circuit court denied Turner's motion to suppress, recognizing first that Turner never stopped at the roadblock and second that the officers had the ability to pursue a car that makes a U-turn prior to a checkpoint to check licenses, insurance "and other things." The jury ultimately found Turner not guilty on Count I and guilty on Counts II-V. Turner then filed his J.N.O.V. Motion on October 2, 2019. In the J.N.O.V. Motion, Turner argued, among other things, that the circuit court erred by failing to grant a mistrial after the State commented on Turner's failure to call a witness on his behalf. Turner also argued that the verdict was against the overwhelming weight of the evidence, that the circuit court erred by failing to order production of body cameras, that the circuit court erred by permitting the testimony of Agent

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Woodruff regarding ballistics and firearms and that the circuit court erred by denying Turner's motion to suppress based on the claimed unconstitutional roadblock. On October 8, 2019, the circuit court entered its judgments reflecting the jury's verdicts and denied the J.N.O.V. Motion on October 14, 2019. Turner appeals his convictions and the order denying the J.N.O.V. Motion.

## ISSUES ON APPEAL

¶10.   Turner raises the following issues on appeal, which we address in turn: (I) whether there was insufficient evidence to support the convictions for Counts III and IV; (II) whether the circuit court erred by allowing the State to present improper lay-opinion evidence; (III) whether the circuit court erred by determining the roadblock was constitutional; (IV) whether the circuit court erred by allowing the district attorney to comment to the jury regarding Turner's decision to not call a witness; (V) whether the circuit court erred by not requiring the State to produce body- and dash-camera footage to Turner; and (VI) whether the circuit court erred by overruling Turner's objection to the district attorney's use of a scaled drawing at trial that was not produced to Turner.

## STANDARD OF REVIEW

¶11.   "When testing the sufficiency of the evidence, this Court uses a *de novo* standard of review." **Sanford v. State**, 247 So. 3d 1242, 1244 (Miss. 2018) (citing **Brooks v. State**, 203 So. 3d 1134, 1137 (Miss. 2016)). Thus, "[t]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" **Id.** (internal quotation marks omitted) (quoting **Hearn v. State**, 3 So. 3d 722, 740 (Miss. 2008)).

6

And "[t]he evidence is viewed in the light most favorable to the State." *Id.* (quoting *Henley v. State*, 136 So. 3d 413, 415 (Miss. 2014)).

¶12. Moreover, "[w]hen reviewing a trial court's decision to allow or disallow evidence, . . . we apply an abuse of discretion standard." *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 145-46 (Miss. 2008) (internal quotation marks omitted) (quoting *Canadian Nat'l/Ill. Cent. R.R. v. Hall*, 953 So. 2d 1084, 1094 (Miss. 2007)). "Therefore, the decision of a trial court will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003) (quoting *Puckett v. State*, 737 So. 2d 322, 342 (Miss. 1999)). Furthermore, "where questions of law are raised the applicable standard of review is *de novo*." *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999) (citing *Bank of Miss. v. S. Mem'l Park, Inc.*, 677 So. 2d 186, 191 (Miss. 1996)).

## ANALYSIS

¶13. For the reasons discussed below, we hold that each assignment of error lacks merit and, as a result, we affirm Turner's convictions and the circuit court's denial of Turner's J.N.O.V. Motion.

## I. Sufficiency of the Evidence for Counts III and IV

¶14. Turner argues that insufficient evidence was presented at trial to support the jury's guilty verdicts on Counts III and IV for aggravated assault of a law-enforcement officer and that "[t]he State wholly failed to present any credible evidence to establish that the Defendant

7

did not act in necessary self-defense."  The State instead argues that the proper question is "of weight and credibility, not sufficiency, and it is to be decided by the jury."

¶15.    Mississippi Code Section 97-3-7(2) provides that

> (a) A person is guilty of aggravated assault if he . . . (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm . . . .
>
> (b) However, a person convicted of aggravated assault upon any of the persons listed in subsection (14) of this section under the circumstances enumerated in subsection (14) shall be punished by a fine of not more than Five Thousand Dollars ($5,000) or by imprisonment for not more than thirty (30) years, or both.

Miss. Code Ann. § 97-3-7(2) (Rev. 2020).  Subsection (14) provides that assault upon various enumerated classes of individuals, including law-enforcement officers acting within the scope of their "duty, office or employment at the time of the assault . . . [,]" acts as an aggravating factor under Section 97-3-7(2)(b).  Miss. Code Ann. § 97-3-7(14)(a) (Rev. 2020).

¶16.    For Count III, the circuit court provided the following jury instruction:

> Brian Russell Turner is charged in Count III with the felony offense of aggravated assault on a law enforcement officer.  If you find beyond a reasonable doubt from the evidence in this case that:
>
> . . . On or about May 3rd, 2018, in Tishomingo County;
>
> Brian Russell Turner did knowingly and purposely cause or attempt to cause bodily injury to James Guthery;
>
> With a deadly weapon, a gun; and
>
> At the time of the assault, James Guthery was acting within the scope of his duty and/or employment as a law enforcement officer; and

Brian Russell Turner was not acting in necessary self-defense,

Then you shall find Brian Russell Turner guilty as charged in Count III. If the prosecution has failed to prove any one or more of these listed elements beyond a reasonable doubt, then you shall find him not guilty of Count III.

The circuit court provided an almost identical instruction for Count IV regarding Turner's aggravated assault of Deputy Moore.

¶17.    For the self-defense instruction, the circuit court provided the following:

To make an assault justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present, and urgent, or the defendant must have reasonable grounds to apprehend a design on the part of the other person involved in the altercation to kill the defendant or do him some great bodily harm, and in addition to this, the defendant must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts.

As to any count, if you find from the evidence that Brian Russell Turner acted in self-defense, then you must find him not guilty in such count.

If, however, you find from the evidence in this case beyond a reasonable doubt that the State has proven the necessary elements of aggravated assault and that the defendant did not act in necessary self-defense, you should find the defendant guilty as charged.

The intent or purpose for an act is a question to be determined by you, the jury, from consideration of the evidence presented in this case. In doing so, intent can be inferred from the defendant's actions, conduct, expressions, and from the circumstances surrounding the charged crime.

An aggressor is not entitled to assert the defense of self-defense. As to any count, if you find that Brian Russell Turner was the initial aggressor in the series of events, then Brian Russell Turner may not claim that he acted in self-defense.

. . . .

9

The apprehension or fear that will justify assaulting another in self-defense must appear objectively real to a reasonable person of average prudence. Stated another way, the actor's apprehension must be objectively reasonable before his assault is justified.

¶18. Since Turner's argument fails under both the sufficiency-of-the-evidence and weight-of-the-evidence standards, we find Turner's first assignment of error to be without merit. Again, for sufficiency, "[t]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Sanford*, 247 So. 3d at 1244 (internal quotation marks omitted) (quoting *Hearn*, 3 So. 3d at 740). Further, "[t]he evidence is viewed in the light most favorable to the State." *Id.* (quoting *Henley*, 136 So. 3d at 415). Officer Guthery testified that after shooting at Turner in response to Turner raising a gun and rocking toward him, Turner returned fire at him. Deputy Moore corroborated Officer Guthery's testimony and testified that Turner shot at Deputy Moore as well. It is undisputed that Officer Guthery and Deputy Moore were law-enforcement officers acting within the scope of their duties at the time Turner shot at them. The jury heard the testimony of Investigator Mitchell, Agent Woodruff and Amber Conn, a crime-scene analyst with the Mississippi Bureau of Investigation.

¶19. Specifically, Investigator Mitchell testified that Turner gave a statement indicating that Deputy Moore put a gun to Turner's head. Agent Woodruff testified that Turner told him that he was acting in self-defense when he fired at Officer Guthery and Deputy Moore and that, upon the initial stop, Deputy Moore "stuck a gun in his face, ordered him out of the truck, and that he first refused." Turner also told Agent Woodruff that "all law enforcement in Tishomingo County, as well as the highway patrol, was out to kill him." Turner further

10

told Agent Woodruff that he felt as though law enforcement had a plan to kill him for several years and that Deputy Moore intentionally rammed his truck and began shooting at him once their vehicles stopped following the collision prior to seeing any firearm in Turner's possession.

¶20.    Turner also told Agent Woodruff that Officer Guthery and Deputy Moore were aiming for his head when they were shooting at him.  Agent Woodruff, however, noted that Officer Guthery and Deputy Moore likely would have shot Turner in the head if they were in fact aiming at his head.  When asked whether he could tell the jury if Turner acted in self-defense, Agent Woodruff testified, "I can tell you that based on what he told me in his statement  and the evidence collected from the shell casing locations and the trajectories and all that, that his statement was inaccurate and the officers' statement did line up with those type [sic] of evidence."  Amber Conn, when asked whether she could tell the jury if, based on her investigation of Deputy Moore's and Officer Guthery's vehicles, Turner was acting in self-defense, she responded, "No, I can't."

¶21.    Given the testimony before the jury of Officer Guthery that Turner rocked toward Officer Guthery with a rifle drawn before Officer Guthery fired at Turner in response, as well as Officer Guthery's and Deputy Moore's testimony that Turner shot at each of them, a rational trier of fact could, and indeed did, find that each element of aggravated assault under Mississippi Code Section 97-3-7(2)(b) was proved beyond a reasonable doubt. *See Scott v. State*, 220 So. 3d, 957, 962 (Miss. 2017) (quoting *Hardy v. State*, 137 So. 3d 289, 303-04 (Miss. 2014)).  Specifically, the testimony before the jury established that Turner attempted

11

to cause bodily injury to Officer Guthery and Deputy Moore with a deadly weapon. Further, Turner's version of events provided to Agent Woodruff was not sufficient to convince the jury that was given a self-defense instruction that Turner was acting in self-defense. *Id.* at 962-63 (recognizing that "[a]lthough Scott's testimony contradicts this version of events, his testimony was not sufficient to convince the jury that he was acting in self defense."). Since, when viewing the evidence in the light most favorable to the State, a rational trier of fact could find that each element of aggravated assault of a law-enforcement officer was met here, we hold that sufficient evidence supported Turner's convictions on Counts III and IV.

¶22.    Furthermore, and to the extent Turner's argument encompasses a challenge to the weight of the evidence supporting his convictions, Turner's convictions in Counts III and IV were not against the weight of the evidence. "When considering a challenge to the weight of the evidence, we review the evidence in the light most favorable to the verdict." *Scott*, 220 So. 3d at 963 (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997), *disagreed with on other grounds by Dilworth v. State*, 909 So. 2d 731, 735 n.4 (Miss. 2005)). And the Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (internal quotation mark omitted) (quoting *Bush v. State*, 895 So. 2d 836 (Miss. 2005), *abrogated on other grounds by Little v. State*, 233 So. 3d 288 (Miss. 2018)); *see Little*, 233 So. 3d at 292 (addressing the Court's role in reviewing a decision to grant or deny a motion for new trial and the associated task of "weigh[ing] the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence

12

that to allow it to stand would sanction an unconscionable injustice'" (second alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017))).

¶23. When viewed in the light most favorable to the verdict, Turner's convictions on Counts III and IV are not so contrary to the overwhelming weight of the evidence that allowing them to stand would sanction an unconscionable injustice. Again, the jury had before it the testimony of Officer Guthery and Deputy Moore indicating that Turner shot at them. The jury also had before it the testimony concerning Turner's claim of self-defense. The question of the objective reasonableness of Turner's apprehensions forming the basis for his self-defense claims was left for the jury to decide. Thus, when viewing the evidence in the light most favorable to the guilty verdicts, allowing Turner's convictions to stand would not sanction an unconscionable injustice but, rather, would simply uphold the jury's determination, after weighing the evidence presented at trial, that Turner did not fire upon the officers in self-defense. As a result, we also hold that Turner's convictions under Counts III and IV are not against the overwhelming weight of the evidence.

## II. Improper Lay-Opinion Evidence

¶24. In his second assignment of error, Turner argues that Agent Woodruff's opinion testimony regarding both the significance of finding taped-together firearm magazines in Turner's vehicle and conclusions surrounding his observation of bullet-hole-trajectory rods constituted improper lay-opinion evidence since Agent Woodruff was not at any time offered or qualified as an expert under Mississippi Rule of Evidence 702. For the reasons discussed

13

below, Turner's second assignment of error is without merit and, to the extent the circuit court committed error by allowing Agent Woodruff's testimony, such error was harmless.

¶25. Rule 701 of the Mississippi Rules of Evidence provides that

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > **(a)** rationally based on the witness's perception;
> >
> > **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

MRE 701. Rule 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > **(b)** the testimony is based on sufficient facts or data;
> >
> > **(c)** the testimony is the product of reliable principles and methods; and
> >
> > **(d)** the expert has reliably applied the principles and methods to the facts of the case.

MRE 702.

¶26. Agent Woodruff, when questioned about the purpose of taping two firearm magazines together based on his experience as an investigator, highway patrolman and Mississippi Bureau of Investigation investigator, testified as follows:

> These, it's for a quick change operation. If you notice how they are offset, this one is sticking up higher, and, of course, it's indented here. So when you have

14

one in the rifle and if you run this magazine empty, you don't have to go back on your person or somewhere else to find another one. It's already right there. You can just remove it, spin it, snap it right back in.

¶27. Turner's defense counsel objected to Woodruff's testimony, stating that the testimony "should be [struck] from the record unless it can be established that Officer Woodruff is an expert in firearms. And I think he is the criminal investigator in this case, Your Honor. That would be our objection." The circuit court overruled the objection, providing that

> I think the witness has been qualified based on his years as a law enforcement officer and having graduated [from] the academy. He's testified generally about the insertion of magazines into a weapon and what the impact of taping them together would be. The testimony is allowed.

¶28. Later, when questioned about the significance of bullet trajectories in the Belmont Police Department patrol car, Agent Woodruff testified that "[t]hat is the location of where Officer Guthery was, and that also indicates that Mr. Turner would have had to have been outside of his truck near the front of his truck to get that angle coming across." Turner's defense counsel objected, requesting that the testimony be struck "unless he can be qualified as some type of ballistics expert." The State responded that "he's already had the testing done by the experts. Now he's testifying about what his investigation revealed as a result of those – of that testing, and we have had the people who performed that test here to testify about it." The circuit court ultimately allowed Agent Woodruff "to testify to what his investigation resulted in."

¶29. Turner argues that his convictions should be reversed since the circuit court allowed a lay witness, and specifically a law-enforcement witness, to testify regarding what Turner contends should be reserved for the province of a ballistics expert. Further, Turner argues

15

that Agent Woodruff's experience as a law-enforcement agent informed his testimony regarding the firearm magazines and bullet trajectory, which Turner believes is beyond the experience of an average, randomly selected adult.

¶30.    As Turner points out, "[t]his Court has held that, '[b]ecause the public hold police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such.'" ***Kirk v. State***, 160 So. 3d 685, 693 (Miss. 2015) (second alteration in original) (quoting ***Roberts v. Grafe Auto Co., Inc.***, 701 So. 2d 1093, 1099 (Miss. 1997)).  In ***Kirk***, the Court recognized that when "an issue to be determined at trial was whether the injuries sustained by Casey were caused by strangulation" and when a deputy testified that it appeared Casey had been strangled, the same opinion was "the sort of testimony properly reserved to an expert." ***Id.*** In ***Roberts***, Officer Bitowf testified as to the cause of an accident—the ultimate issue at trial. ***Roberts***, 701 So. 2d at 1098-99.  Here, however, the ultimate issues to be determined at trial were whether Turner committed aggravated assault on a law-enforcement officer, whether he failed to stop his vehicle pursuant to the signal of law-enforcement and whether he possessed a firearm as a felon.

¶31.    We hold that the circuit court did not err by overruling Turner's objection to Agent Woodruff's testimony regarding taped-together firearm magazines, as no specialized knowledge of firearms or firearms training is required to arrive at Agent Woodruff's conclusion; therefore, his testimony was not expert-opinion testimony covered by Rule 702. Stated differently, no expert testimony is required to opine about the utility of taping firearm

16

magazines together and the ultimate result—the ability to more quickly reload a gun. Such testimony, rather, is common sense. Moreover, Agent Woodruff's opinion was based on his rational observations of the firearm magazines. Thus, Agent Woodruff's testimony was lay-opinion testimony, and the circuit court did not err by overruling Turner's objection.

¶32. Even assuming, *arguendo*, that the circuit court did err by allowing the testimony, unlike in **Kirk** and **Roberts**, Agent Woodruff's discussion of the benefit of taping firearm magazines together has no bearing on whether Turner committed aggravated assault or acted in self-defense. In other words, Turner was not prejudiced by Agent Woodruff's testimony regarding the firearm magazines and, therefore, any potential error resulting from the admission of Agent Woodruff's testimony was harmless. *See **Davis v. State***, 18 So. 3d 842, 850 (Miss. 2009) ("Harmless errors are those which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (internal quotation marks omitted) (quoting ***Williams v. State***, 991 So. 2d 593, 599 (Miss. 2008))). Indeed, the existence of taped-together firearm magazines and Agent Woodruff's opinion about the purpose of taping them together do not help to prove or disprove any elements of the crimes Turner was charged with.

¶33. Moreover, Agent Woodruff's testimony concerning his observations of the bullet-hole-trajectory rods placed by a crime-scene analyst fell within permissible lay-opinion testimony under Rule 701; thus, the circuit court did not abuse its discretion by overruling Turner's objection. Agent Woodruff, when asked about the significance of the trajectory of

the bullets fired, stated, "[t]hat is the location of where Officer Guthery was, and that also indicates that Mr. Turner would have had to have been outside of his truck near the front of his truck to get that angle coming across." After the circuit court overruled Turner's objection on the basis that Agent Woodruff was not qualified as a ballistics expert, Agent Woodruff opined as to the significance of a lack of projectile defects, or bullet holes, in the Tishomingo County patrol car:

> because if this was Deputy Moore, which, again, was the first one that Mr. Turner stated was approaching him to fire at his vehicle, returning fire in the direction of Deputy Moore, if he was in his patrol car, at his patrol car, there should be defects on the patrol car as well, and there was not.

¶34. We hold that the circuit court did not abuse its discretion by overruling Turner's objection to Agent Woodruff's testimony since his testimony is not expert testimony within the meaning of Rule 702. Indeed, Agent Woodruff's opinion regarding Turner's location that would be necessary to achieve a certain bullet-hole-entry angle does not require specialized knowledge of ballistics. Rather, Agent Woodruff's testimony amounted simply to his opinion that was rationally based on his perception of the crime scene and the trajectory information received from Amber Conn and Dywana Broughton, the two crime-scene analysts that provided the evidence of the bullet-hole angles. Moreover, Agent Woodruff's testimony was also helpful to understand the previously elicited testimony of both Conn and Broughton. In sum, it is clear that no specialized knowledge was required for Agent Woodruff to testify that if the trajectory angles provided by Conn and Broughton are believed, then Turner would have likely been at a certain location when shooting.

18

¶35. Further, Agent Woodruff's opinion, while arguably speculative, that if Turner were to be believed, there would likely be bullet-hole damage to Deputy Moore's car if Deputy Moore in fact approached Turner to fire at his vehicle does not require scientific, technical or specialized knowledge subject to Rule 702. Instead, Agent Woodruff's opinion was rationally based on his observation of the crime scene and bullet-hole-trajectory rods and was helpful to understand his testimony, as well as the testimony of Conn and Broughton, the crime-scene analysts that, at the time Agent Woodruff testified, had already testified about the bullet-hole-trajectory angle information. Moreover, Agent Woodruff's testimony can be simplified as follows: a lay opinion as to his interpretation of the significance of the location of the bullet-hole-trajectory rods with respect to the location of Deputy Moore's vehicle based upon his own review of the rods and Broughton's testimony regarding her trajectory-rod analysis.[2] In other words, it required no specialized knowledge to opine on Agent

_____

[2] In his dissent, Presiding Justice King, analyzing the language quoted from Agent Woodruff's testimony in paragraph 33 of this opinion, posits that "Agent Woodruff's testimony regarding the trajectory of the projectiles and the positions of the officers also constituted expert testimony." Diss. Op. ¶ 62. Further, Presiding Justice King states that "[a]n average person certainly would not be able to determine the location of the shooters by looking at bullet holes in vehicles." Diss. Op. ¶ 62. While Presiding Justice King's observation about the ability of average persons to discern the location of shooters based only on bullet holes in vehicles is likely sound, Agent Woodruff did not base his testimony or opinion as to the location of Turner and the law-enforcement officers at this shootout only on bullet holes in vehicles. As discussed above, Agent Woodruff's testimony was based on his observation of bullet-hole-trajectory rods placed within the bullet holes by crime-scene analyst Dywana Broughton. Broughton's testimony detailing the methods used in placing the trajectory rods that makes clear the angles at which the bullets struck the vehicles is not subject to Turner's appeal. Agent Woodruff's observation of these rods, coupled with his examination of the crime scene, formed the basis for his opinion, which did not require specialized knowledge that would bring his testimony within the ambit of Rule 702. Indeed, an average person would certainly be able to determine the location of the shooters when presented with both a crime scene and bullet-hole-trajectory rods. To hold otherwise would

19

Woodruff's own logical conclusion that if Deputy Moore did, in fact, as Turner had claimed, first point a gun at Turner's head while approaching Turner from Deputy Moore's vehicle, when Turner fired back, there would have been damage to Deputy Moore's patrol car.

## III. Constitutionality of the Roadblock

¶36. For his third assignment of error, Turner argues that the roadblock was unconstitutional and, therefore, any evidence obtained subsequent to the roadblock should have been suppressed. As a result, Turner argues that the circuit court erred by denying Turner's motion to suppress. "It is well-settled law that the Fourth Amendment of the United States Constitution 'applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'" *McLendon v. State*, 945 So. 2d 372, 379 (Miss. 2006) (quoting *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)). The same seizure must "be 'reasonable.'" *Id.* (quoting *Brown*, 443 U.S. at 50).

¶37. Further, the Court "must consider the required balancing test in determining the issue of reasonableness outlined in *Brown*." *Id.* This test "weighs 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* (quoting *Brown*, 443 U.S. at 50-51). Stated differently, "[t]he reasonableness of seizures that are less intrusive than a traditional arrest . . . depends on a balance between the public interest and the individual's

---

require us to accept the premise that an average person is not privy to the fact that bullets travel in a relatively straight line from the barrel of a gun or that the shooter's location could be discerned by observing the angle at which a bullet entered the vehicles.

right to personal security free from arbitrary interference by law officers." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Brown*, 443 U.S. at 50).

¶38.    While the Fourth Amendment protects a person from unreasonable searches and seizures, Turner has not alleged that a Fourth Amendment seizure occurred at the roadblock. Indeed, he even admits no such seizure occurred.[3]   Therefore, since no facts indicate a seizure occurred at the roadblock, a fact Turner admits, Turner's argument is not well-taken, and we decline to address the constitutionality of the roadblock on appeal.  *See, e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) ("It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990))).

¶39.    Additionally, we hold that the trial court did not abuse its discretion by denying Turner's motion to suppress, since no unreasonable seizure occurred when Deputy Moore followed and ultimately stopped Turner.  Turner concedes that "[t]his Court has ruled when a motorist evades a police roadblock, the police may stop them and check the validity of their license tag, and inspection sticker."  Indeed, "[w]hen a motorist evades a police roadblock we have recognized that police may stop them and check the validity of their license tag, and inspection sticker."  *Boches v. State*, 506 So. 2d 254, 264 (Miss. 1987) (citing *Morgan v. Town of Heidelberg*, 246 Miss. 481, 150 So. 2d 512, 516 (Miss. 1963)).

---

[3] In fact, in his argument attacking the constitutionality of the roadblock under the Fourth Amendment, Turner admits that he was not seized at the roadblock. ("Though the Defendant did not actually experience a 'seizure' at the roadblock, the illegality of the roadblock should require the suppression of any evidence related thereto.").

¶40. Deputy Moore followed Turner to check the validity of his tags after Turner turned around prior to entering the roadblock. Therefore, under ***Boches***, Deputy Moore's seizure of Turner in the initial traffic stop did not result in a violation of Turner's Fourth Amendment rights against unreasonable seizures. Further, Deputy Moore had probable cause sufficient to satisfy the Fourth Amendment prior to initiating the stop. "In ***Whren v. United States***, the United States Supreme Court stated that, generally, 'the decision to stop an automobile is reasonable where the police have *probable cause* to believe that a traffic violation has occurred' regardless of the officer's subjective intent." ***Martin v. State***, 240 So. 3d 1047, 1051 (Miss. 2017) (quoting ***Harrison v. State***, 800 So. 2d 1134, 1138 (Miss. 2001) (quoting ***Whren v. United States***, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 660 (1979))). In other words, "when a police officer personally observes a driver commit what he reasonably believes is a traffic violation, he then has probable cause to stop the vehicle." ***Id.*** at 1052.

¶41. Deputy Moore, before following Turner for turning around before the roadblock, observed that Turner's tag light was out and, upon further investigation, realized that Turner's tag was expired. Therefore, in addition to witnessing Turner turning around before the roadblock, Deputy Moore personally observed Turner commit what he reasonably believed to be a traffic violation and, as a result, had probable cause to stop Turner's vehicle. Turner's third assignment of error is therefore without merit.

**IV.    The State's Comment Regarding Turner's Failure to Call a Witness**

22

¶42. In his fourth assignment of error, Turner argues that the circuit court erred by allowing the State, during its closing argument, to comment on Turner's failure to call Officer Belue as a witness. Because Turner's counsel first commented on the State's failure to call Officer Belue to testify prior to the State's comment on Turner's failure to do so, we find that Turner's fourth assignment of error lacks merit. As Turner correctly notes, we have held that "the failure of either party to examine a witness equally accessible to both is not a proper subject for comment before a jury by either of the parties." *Morgan v. State*, 388 So. 2d 495, 498 (Miss. 1990) (internal quotation mark omitted) (quoting *Phillips v. State*, 183 So. 2d 908, 911 (Miss. 1966), *overruled on other grounds by* *Harrison v. State*, 534 So. 2d 175 (Miss. 1988)). Even so, the circuit court correctly pointed out that Turner, in first speculating as to the reasons for the prosecution's failure to call Officer Belue as a witness, opened the door for the prosecution to do the same. In response, Turner's counsel withdrew the objection.

¶43. Following the objection withdrawal, Turner's counsel objected to the following speculative comment from the State: "And he said we couldn't know what – he didn't know what he would have to say about Rodney Belue's testimony if he was here. I do. You do. He would say he's another one of these bad apples." The circuit court sustained Turner's second objection, and Turner's counsel neither requested an admonition to the jury nor a peremptory instruction. "When a trial court sustains an objection it cures any error." *Holland v. State*, 705 So. 2d 307, 335 (Miss. 1997). Thus, any error allegedly caused by the

23

State's comment regarding Turner's failure to call Officer Belue in its closing argument was cured. As a result, Turner's argument regarding this assignment of error is without merit.

## V.     Discovery of Body Cameras

¶44.    Since the circuit court ordered law-enforcement agencies to produce any and all body-camera and/or dash-camera footage that they possessed and since multiple law-enforcement witnesses testified that the agencies were not in possession of any body- and/or dash-camera footage, Turner's fifth assignment of error also lacks merit. Again, the circuit court ordered the State "to provide all evidence, including dash cam video, that they have in their possession or through reasonable means of investigation can uncover." The circuit court went a step further, ordering that the State provide any exculpatory material covered by *Brady*, 373 U.S. 83, to the defense as well.

¶45.    Turner correctly points out that the Court, in *Hentz v. State*, 489 So. 2d 1386, 1388 (Miss. 1986), held that "as a matter of good practice and sound judgment in the trial of criminal cases, prosecuting attorneys should make available to attorneys for defendants all such material in their files and let the defense attorneys determine whether or not the material is useful in the defense of the case." The problem with Turner's argument, however, is that the State did not refuse to produce body- and/or dash-camera footage. Instead, each relevant law-enforcement witness for the State testified under oath that footage from body and/or dash cameras was not available. Therefore, we decline Turner's request to hold that "[t]he Circuit Court erred in not requiring the State to provide the body camera to Mr. Turner, prior to

24

trial." The circuit court did exactly what Turner requested—it required the State to turn over any body- and/or dash-camera footage to the defense.

## VI.    Turner's Objection to the Use of a Scaled Drawing

¶46.    In his sixth and final assignment of error, Turner argues that the circuit court erred by allowing the State to use, over Turner's objection, a not-to-scale demonstrative in front the jury depicting the "accident and or shooting scene on Joel Cemetery Road" that was not provided to Turner prior to trial.  Turner points to Mississippi Rule of Criminal Procedure 17, which he argues required the disclosure of the demonstrative to the defense prior to trial.

¶47.    Rule 17.2 provides that

> Subject to the exceptions of Rule 17.6(a) and 17.7, the prosecution must disclose to each defendant or to the defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order, the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
>
> (1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement (written, recorded or otherwise preserved) of each such witness and the substance of any oral statement made by any such witness;
>
> (2) Copy of any written or recorded statement of the defendant and the substance of any oral statement made by the defendant;
>
> (3) Copy of the criminal record of the defendant;
>
> (4) Any reports, statements, or opinions of experts (written or otherwise preserved) made in connection with the particular case and the substance of any oral statement made by any such expert;

(5) Any physical evidence, photographs, and data or information that exists in electronic or magnetic form relevant to the case or which may be offered in evidence; and

(6) Any exculpatory material concerning the defendant.

Upon a showing of materiality to the preparation of the defense, the court may mandate such other discovery to the defendant's attorney as justice may require.

MRCrP 17.2.

¶48. The State offered the scaled drawing of the crime scene as a demonstrative only. The circuit court recognized this fact:

For the record, the prosecution put forward an exhibit. It is a white magnetic dry erase board presented with what looks to be handwritten documentation describing the scene of the crime, the alleged crime. There are magnetic automobiles, replicas, three of which have been used by the prosecution to move around the board for use in describing the scene.

The use of this exhibit was objected to by the defense and overruled by the Court. And the defense may use the exhibit as well, demonstrative evidence, which was the finding that I made that it's being used for that only.

Although Turner neither argued nor did the circuit court discuss Rule 17 during trial, the plain language of Rule 17.2 does not address nor require the production of demonstratives prior to trial.

¶49. Furthermore, "[t]he admission of 'reasonably necessary and material' demonstrative evidence is within the discretion of the trial court." *Lewis v. State*, 725 So. 2d 183, 189 (Miss. 1998) (quoting *Murriel v. State*, 515 So. 2d 952, 956 (Miss. 1987)). To that end, the trial judge is generally given "broad discretion in ruling upon the admissibility of many types of demonstrative evidence." *Id.* (internal quotation mark omitted) (quoting *Murriel*, 515 So.

2d at 956). Given the wide latitude afforded to a trial court's decision to admit demonstrative evidence, the circuit court did not abuse its discretion by allowing the use of the demonstrative and by overruling Turner's objection based on the State's failure to produce demonstrative evidence prior to trial. Therefore, Turner's sixth and final assignment of error lacks merit.

**CONCLUSION**

¶50. Each of Turner's assignments of error lack merit. Therefore, we affirm Turner's convictions and the circuit court's denial of Turner's J.N.O.V. Motion.

¶51. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶52. Because I would find that the trial court committed reversible error by allowing Agent Keith Woodruff to present improper expert-opinion testimony, I respectfully dissent.

¶53. "The admission of expert testimony is addressed to the sound discretion of the trial judge. Unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *Seal v. Miller*, 605 So. 2d 240, 243 (Miss. 1992) (citing *Hooten v. State*, 492 So. 2d 948, 950-51 (Miss. 1986)). Mississippi Rule of Evidence 701 provides,

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;

27

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

MRE 701. Mississippi Rule of Evidence 702 states,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

MRE 702. Therefore, "[b]efore providing expert opinion testimony, a witness must be qualified, tendered, and accepted as an expert under Rule 702 of the Mississippi Rules of Evidence." *Chaupette v. State*, 136 So. 3d 1041, 1045 (Miss. 2014) (citing *Cotton v. State*, 675 So. 2d 308, 312 (Miss. 1996)).

¶54. This Court previously has found that an investigator's testimony regarding gang activity constituted expert testimony because the testimony "was based on specialized knowledge under Mississippi Rule of Evidence 702, because an average, randomly selected adult likely would not be able to identify the Black Disciples or testify about the difference between a gang member and a 'hang-around.'" *Croft v. State*, 283 So. 3d 1, 10 (Miss. 2019). This Court rejected the State's argument that the investigator was merely a lay witness "because his testimony was based on his personal observations of the facts gathered during

28

his investigation and his 'first-hand knowledge' obtained over several years working as a gang investigator in Meridian." *Id.* Additionally, in *Roberson v. State*, this Court held that an investigator's testimony that "following his investigation he did not think [the victim] was 'killed in the wreck'" was expert testimony. *Roberson v. State*, 569 So. 2d 691, 696 (Miss. 1990).

¶55. At Turner's trial, counsel for the State showed Agent Woodruff three gun magazines that had been taped together with electrical tape. Counsel then asked, "[d]oes your training and experience as an investigator and as a highway patrolman and an investigative agent of the Mississippi Bureau of Investigation, based on all of that, what is the purpose of taping magazines together like that?" Agent Woodruff responded:

> These, it's for a quick change operation. If you notice how they are offset, this one is sticking up higher, and, of course, it's indented here. So when you have one in the rifle and if you run this magazine empty, you don't have to go back on your person or somewhere else to find another one. It's already right here. You can just remove it, spin it, snap it right back in.

Turner's counsel objected and argued that the preceding testimony should be struck unless it could be established that Agent Woodruff was an expert in firearms. The trial court overruled the objection and stated, "I think the witness has been qualified based on his years as a law enforcement officer and having graduated [from] the academy. He's testified generally about the insertion of magazines into a weapon and what the impact of taping them together would be. The testimony is allowed."

¶56. "Where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a M.R.E. 702 opinion

and not a [Rule] 701 opinion." *Langston v. Kidder*, 670 So. 2d 1, 3-4 (Miss. 1995) (citing *Miss. State Highway Comm'n v. Gilich*, 609 So. 2d 367, 377 (Miss. 1992)). Because knowledge of "quick change operation[s]" requires special knowledge that a lay person would not be expected to know, I would find that Agent Woodruff's testimony should have been considered expert testimony. Agent Woodruff testified that the magazines were "offset, this one is sticking up higher, and, of course, it's indented here. So when you have one in the rifle and if you run this magazine empty, you don't have to go back on your person . . . . You can just remove it, spin it, snap it right back in." An average, randomly selected person likely would not possess knowledge of "quick change operation[s]" or the intricacies of the indention of magazines.

¶57. The prosecution's line of questioning further supports the conclusion that Agent Woodruff improperly presented expert testimony under the guise of lay-opinion evidence. The prosecution prefaced its question regarding the testimony of taped-together magazines with "[d]oes your training and experience as an investigator and as a highway patrolman and an investigative agent of the Mississippi Bureau of Investigation, based on all of that . . . ." Yet "[a] lay witness's unique qualifications have no bearing on the witness's ability [to] give a lay opinion." *Collins v. State*, 172 So. 3d 724, 739 (Miss. 2015) (internal quotation marks omitted) (quoting *Heflin v. Merrill*, 154 So. 3d 857, 863 (Miss. 2014)). Therefore, I would find that the trial court erred by allowing Agent Woodruff to present evidence regarding the taped-together magazines.

30

¶58. I disagree with the majority's conclusion that any error was harmless. This Court has clearly stated that "because 'the public hold police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such.'" *Id.* (quoting *Kirk v. State*, 160 So. 3d 685, 693 (Miss. 2015)). Agent Woodruff clearly was an officer of the law and his opinion held great sway with the jury. Thus, the potential harm resulting from his testimony cannot be considered harmless.

¶59. Agent Woodruff's testimony ran "afoul of our stated policy requiring that expert witnesses be first tendered as such before being allowed to express expert opinions." *Sample v. State*, 643 So. 2d 524, 529 (Miss. 1994) (citing *Roberson*, 569 So. 2d at 696). "To sanction this testimony attempts to circumvent this policy by the familiar retreat to [Rule] 701, which some attorneys would use to justify all transgressions of our discovery and evidentiary policies concerning expert opinion." *Id.* Accordingly, I would find that the admission of Agent Woodruff's testimony without first qualifying him as an expert cannot be considered harmless. I submit that this issue requires reversal.

¶60. Likewise, Agent Woodruff was allowed to testify regarding the location of the officers while they were firing at Turner, testimony of which he had no firsthand knowledge. Agent Woodruff testified as follows:

> So this would be Deputy Moore's rounds. And then he also indicated how that Officer Guthery was approaching his vehicle firing rounds on me as well when he came up.

> This – the yellow ones here indicating the .40 caliber rounds, this is all Officer Guthery's shell casings. Now, this was Officer Guthery's patrol car and Mr. Turner's pickup.

So what stands out – one of the things that stands out here is had Officer Guthery been approaching the side of Mr. Turner's pickup firing at him, then the shell casings that are marked in yellow, there would be some up here in this area in the front of his patrol unit.

Instead, Officer Guthery's statement that he typed up and gave to us indicated that he then was immediately retreated, that whenever he saw a rifle come up inside the pickup, he began firing as he was retreating.

The weapon that Officer Guthery had is going to eject up and right, by the way. So when he is standing here, this is going to be his shell casings.

Another thing that is important is Officer Guthery talking about being at the rear of his patrol car. There was a projectile that was recovered from the rear of Officer Guthery's patrol car that came out of Officer Guthery's own gun. So that verifies to us that he, indeed, was at the rear of his patrol car.

. . . .

The other things that's talking about Deputy Moore, these green indicate Deputy Moore's shell casings, which these will coincide actually with trajectory that was taken from Mr. Turner's pickup showing the angles of the rounds coming from Deputy Moore. He was not right up on the pickup, for one. And you can see these over here, which, again, Deputy Moore's statement to us was when he was – when he felt like he was under fire, he was retreating to the bridge. These two shell casings here, again, corroborate Deputy Moore's statement by finding them at the location that he stated that he was at.

¶61.    The prosecution then asked, "[a]nd when Dywana Broughton performed the trajectory analysis to the entrance defects on the driver's side of the suspect's truck, what was the trajectory of those?" Agent Woodruff responded, "[t]hey were showing right to left, front to back. In other words, when you're standing looking at that pickup on this side, they would be coming from the right to the left, front to back, at an angle." The prosecution then again stated, "[b]ased on your training and experience as an investigator, would that angle be the same if he was approaching the driver's side door attempting to shoot Mr. Turner? . . . How

32

does that – if you know, how does that trajectory relate to the defendant's version of what happened?" Agent Woodruff responded that "[i]t opposes it."

¶62.    The testimony continued, and the prosecution asked whether Amber Conn had performed a trajectory analysis on one of the patrol cars. Agent Woodruff responded that she had and stated,

> Indicated front passenger – you said passenger. Some people say right or left. Just to clarify, the front passenger trajectory to right driver's side rear. . . . That is the location of where Officer Guthery was, and that also indicates that Mr. Turner would have had to have been outside of his truck near the front of his truck to get that angle coming across.

Counsel for Turner again objected and asked that the testimony be struck unless Agent Woodruff could be qualified as a ballistics expert. The trial court allowed Agent Woodruff "to testify to what his investigation resulted in." In my opinion, Agent Woodruff's testimony regarding the trajectory of the projectiles and the positions of the officers also constituted expert testimony. *See* **Parvin v. State**, 113 So. 3d 1243, 1249 (Miss. 2013). An average person certainly would not be able to determine the location of the shooters by looking at bullet holes in vehicles. Additionally, the prosecution again prefaced its question by asking Agent Woodruff to speculate based on his training and experience.[4]

---

[4]The majority states that "an average person would certainly be able to determine the location of the shooters when presented with both a crime scene and bullet-hole-trajectory rods." Maj. Op. ¶ 35 n.2. Yet trajectory rods are not something an average person utilizes. The majority would make it seem as simple as sticking a stick in a bullet hole and determining which direction it faced. However, whether the rods accurately depicted the trajectory of the bullets would depend on whether the correct size rod was used, whether the rod was inserted into the bullet hole correctly, whether an improperly inserted rod had changed the size or shape of the bullet hole, etc. Although Agent Woodruff was not the person who placed the trajectory rods, Agent Woodruff's experience and knowledge with his position at the Mississippi Bureau of Investigation assisted him in making those

¶63. This error also cannot be considered harmless. Turner's defense rested on the contention that law enforcement first fired upon him and that he returned fire only in self defense. However, Agent Woodruff testified that Turner could not have been inside his truck, returning fire in self-defense. He stated that Turner "would have had to have been outside of his truck near the front of his truck to get that angle coming across." Therefore, his testimony negated Turner's version of events.

¶64. The jury heard a member of law enforcement, who had not been qualified as an expert, testify as to the meaning of a quick-change operation with taped-together magazines and testify that Turner was outside of his truck firing at the officers and agents based on the trajectory of bullets. Therefore, I would find that the trial court committed reversible error by allowing Agent Woodruff to testify to scientific, technical, and specialized knowledge without first being qualified as an expert. Accordingly, I dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**

---

determinations. Thus, Agent Woodruff presented expert testimony. Additionally, Agent Woodruff's testimony was not simply that the bullets came from a general direction. He testified to the positions of the shooters based on the directions of the trajectory rods, which required advance measurements and involved the specialized training and experience that falls under Rule 702.